THE GEORGE PRESLEY et al.

(Circuit Court of Appeals, Sixth Circuit. October 8, 1901.)

No. 887.

COLLISION—STEAMER AND TOW—CONCURRING FAULT.

A steamer with three vessels in tow on a single line, altogether about 2,500 feet long, was coming down the Detroit river, but had stopped temporarily on the Canadian side, headed upstream, with the steamer in front. As she was turning with the tow to proceed down, and when she and the first tow had turned and headed southward, and were about 400 feet from the American side of the channel, the Yakima, a heavily laden steamer, was half a mile downstream, coming up. At this time the schooner Helvetia, the second of the tow, was headed directly across the river, and about midstream, while the last tow was still headed upstream. The navigable channel was straight, 1,800 feet wide, and the current about 2½ miles an hour. The Yakima signaled her intention to pass between the fleet and the American side, which was assented to. Both steamers starboarded slightly, and the Yakima checked speed to about 4 miles. When 600 feet apart, the master of the Yakima observed that the tow was not under control and was not turning properly, but kept on, and, after passing the other steamer, turned in as close as possible to shore. The Helvetia, through improper steering, failed to follow the vessels ahead, but swung over towards the American side, and struck the bluff of the Yakima's bow at right angles. Held, that the Helvetia was clearly in fault, but that the Yakima was

also guilty of contributory fault, conceding that she was justified in attempting to pass on the side she did; that, being alone and ascending the stream, the duty rested upon her to keep out of the way of the descending tow, and to stop if the situation required it; and that she should have stopped when it first became apparent that the tow was not turning properly, the other steamer being then from 200 to 300 feet to her starboard side, where there was little danger of collision between the two.

Appeal from the District Court of the United States for the Eastern District of Michigan.

In Admiralty.

About midday, in a substantially straight channel of the St. Clair river, the steamer Yakima came into collision with the schooner Helvetia, both receiving considerable injuries. The navigable channel of the river is substantially 1,800 feet wide. From shore to shore its width is about 2,100 feet. The witnesses in general refer to the banks of the deep-water channel, and not to the visible shore line, and we shall do likewise, unless specifically mentioned. The Helvetia was one of a tow of three in tow of the steamer George Presley, bound down the river, all loaded. The length of the entire tow was not much short of 2,400 feet, the tow lines ranging from 400 to 500 feet each in length, and the vessels from 200 to 300 feet each in length. The Helvetia was probably on the longest tow line, and was the longest vessel in the tow. For a temporary purpose, the Presley and her tow came to anchor along the Canadian side of the river, heading up, the tow tailing downstream. The Yakima, loaded with coal, was bound up the river. When she came in sight, the Presley and her tow were in the process of coming around to again head down the stream. When within a half mile of the Presley, the Yakima observed that the Presley and the first of her tow, the disabled steamer, Johnson, had made the turn and were headed down the river, and were about 400 feet out from the American channel bank. The Johnson was a bit nearer the bank, but was following substantially behind the Presley. The Helvetia, on a line variously estimated as from 400 to 600 feet, was at that time about midriver, headed almost directly across stream. The Reddington, the last in the tow, was possibly two to three hundred feet out from the Canadian channel bank, headed upstream. The lines between each of the tow seemed to be taut. Two courses were now open to the Yakima: First, she might follow the tow around and pass port to port; or, second, she might pass up on the American side, having the tow on her starboard hand. She chose the second, and blew two whistles, signifying her desire to go up on the American side of the channel. To this the Presley at once assented, by replying with a passing signal of two blasts. Under this agreement both steamers starboarded a trifle, the Yakima being brought to head between the Presley and the American channel bank. When from 1,000 to 1,500 feet below the Presley the Yakima checked down to a claimed speed of about 4 miles, and passed the Presley at a distance of from 200 to 300 feet on her starboard hand. After passing the Presley, and when nearly abreast of the Johnson, seeing the Helvetia coming out from behind the stern of the Johnson, and still headed for the American shore, she starboarded again, and increased her speed for the purpose of holding close into the channel bank, and of passing, if possible, before the Helvetia should strike the bank. The Yakima was crowded against the channel bank as far as possible, but the effort to escape collision failed. The stem of the Helvetia struck the bluff of her bow nearly at a right angle. The court below held the Helvetia wholly at fault, and dismissed her cross libel. The Yakima was given her full damages against the Helvetia, but her libel was dismissed so far as it sought to hold the Presley and Reddington at fault. The Helvetia alone has appealed.

Harvey D. Goulder and Frank S. Masten, for appellants.

John C. Shaw, for appellee.

Before LURTON and SEVERENS, Circuit Judges, and WING, District Judge.

LURTON, Circuit Judge, after making the foregoing statement of the case, delivered the opinion of the court.

We have no hesitation in agreeing with the court below as to the fault of the Helvetia. The testimony of her master that she was kept under a port helm until within 300 feet of the American shore before starboarding to come around is an admission of a plain and palpable fault. His anxiety not to make a shorter turn than the Johnson induced him to hold her up under a port helm until it was impossible to turn in time to avoid a collision with the Yakima, which was plainly seen coming up between the tow and the American shore. The story of the Helvetia's wheelsman, that he, without orders from his captain, on deck at his side, put his wheel to starboard when little over midway the river, is contradicted, not only by the positive testimony of her captain, but by the fact that she struck the bluff of the bow of the Yakima at nearly right angles, when the Yakima was crowded into shallow water against the channel bank. The thing speaks for itself. His wheel was not put over to starboard when it should have been, otherwise the Helvetia would not have gone upon so erratic a course. The man at the Helvetia's wheel was an ordinary seaman, doing his trick at the wheel. To assume that the Halvetia's master trusted the management of his vessel to this common seaman when making a movement which required skill and soundness of judgment to avoid risk of collision with the Yakima, plainly seen to be coming up between the tow and the American bank, is to convict him of utter indifference to an ominous situation, or total ignorance of the duties pertaining to his station. The management of the maneuver by the Helvetia, whether the fault of her wheelsman or master, was negligent and unskillful.

The case against the Yakima presents a more difficult question. The court below thought that the situation, as it appeared when the Yakima proposed to pass starboard to starboard, was one which reasonably admitted of such a maneuver. At that time the Presley and the Johnson were both headed down the river, the Johnson substantially following behind the Presley. There was then probably 500 feet of clear channel between the Presley and the American channel bank, and 400 feet between the Johnson and that bank. If the Helvetia and Reddington should both make the same turn as that which had been made by the Presley and Johnson, they would leave not less than a 400-foot channel for the Yakima to pass up on their starboard hand. Doubtless it would have been more prudent to have followed the tow around and passed port to port after they had straightened out. The danger of getting up into the bight of the tow was small, in view of the fact that the Yakima was ascending a current of 2½ miles, and was heavily loaded. In such circumstances she could have been quite easily held at nearly a standstill until the tow should be straightened out, if any complication arose which delayed its coming around. The danger to be apprehended from passing on the starboard side of the Presley before her tow got straightened out behind her was that the Helvetia or the Reddington might make a larger circle than had been made by the

Presley and Johnson, and thus diminish the width of the clear channel up which the Yakima proposed to pass, and thus involve risk of collision. While the maneuver was one which did not present any very imminent risk of collision as the matter presented itself when the passing agreement was made, yet the situation was one which might rapidly change, and the utmost watchfulness was therefore requisite to guard against any complication which might arise in straightening out the lagging members of the tow. Upon the interchange of passing whistles both vessels were promptly starboarded a trifle, so that the Presley was headed towards the middle of the stream, and the Yakima for the middle of the clear channel, between the Presley and the American bank. The Yakima's mate was at this time on top of her pilot house, and in charge of her navigation. He was not insensible to the possible danger of running up between the tow and the American shore before the tow should all get straightened out, for immediately after making the agreement to pass on the starboard hand he ordered his engines checked down. When asked why he did this he replied:

"My idea of that was to give the tow a chance to get straightened down the river. That was my opinion, to give them a show to get turned around before I would get up where they were."

The probabilities are, upon all of the evidence, that this checking down occurred when the Yakima was somewhere in the neighborhood of 1,200 or 1,500 feet below the Presley. When the passing whistles were blown, Capt. Williams, of the Yakima, had just stepped out from the dining cabin, on the starboard side. From that side he saw that the Presley and the Johnson were headed down the river; that the Helvetia was about midstream, and headed across the river; and that the Reddington was not far out from the Canadian bank, and headed upstream, with apparently little headway. He then went onto his forecastle deck. His own account of the matter is as follows:

"I walked back and forth on the forecastle deck once or twice until we were within six hundred feet of the George Presley, the steamer that appeared to be towing, and I noticed by the moving on the Presley that something was wrong. I could see they were acting kind of nervous. She was not handling right,—the tow was not under control, as the action of the men on the wheel house indicated to me. She was uneasy; and I then went on top of the Yakima's wheel house, and took charge from the mate."

This confession of apprehension, when still nearly 600 feet below the Presley, that the tow was not under control or was not coming around right, seems to have been based upon the checking whistle blown by the Presley immediately after assenting to the Yakima's passing signal, and upon evidence of uneasiness exhibited by those on the Presley's wheel house and in charge of her navigation. We are not able, from the evidence of either Capt. Williams or Mate Pringle, to locate the Helvetia or the Reddington at this precise moment. Indeed, it is to be inferred that at this moment the position of the Presley off the starboard bow of the Yakima was such as that she was interposed between the Yakima and the Helvetia. When last seen by Capt. Williams, the Helvetia was about midriver, headed for the American bank, while the Reddington, with little

apparent headway, was still on a taut towline, heading up the river.
A checking whistle from the Presley meant that the headway of
the Reddington would be still further diminished, and that she would
be a still greater hindrance to the proper turning of the Helvetia.
Unless the situation continued to indicate that the Presley's tow
was coming around in an orderly manner and well under control,
the continuance of the Yakima's purpose to push on and pass the
Presley's tow before it got straightened out cannot be justified. The
case, in our opinion, turns here. The indications, whatever they
were, as her captain saw them, were not propitious. He was full of
apprehensions of danger, and fully recognized what his mate had
at an earlier moment recognized by checking, namely, that there
was risk of collision in undertaking to pass this long and unwieldy
tow while in the process of turning to head down the stream in so
narrow a channel. That he did not then stop was not due to any
opinion that the situation was a safe one. His examination on this
point makes it perfectly clear that he was fully conscious that he
was in danger. We quote from his evidence touching this point
in the crisis:

"Q. At that time did you know there were three other barges in that
tow? A. Yes, I certainly did. Q. And you say you cannot give it with any
accuracy, because you didn't note their position at that time? A. No, sir.
Q. You say you didn't note it? A. I didn't note it, to be accurate, just
exactly as to their position. Q. You were navigating with reference to that
tow, were you not? A. I was, most decidedly. Q. Did you take charge of
the vessel as soon as you went on the pilot house? * * * Q. Was there
anything in that situation that you saw then that indicated danger to you?
A. There was. Q. What was it? A. The action of the Presley; the maneu-
vers of the Presley. Q. Why didn't you stop your boat? A. Why didn't
I stop her? Q. Yes. A. I didn't consider that I had room to stop the boat.
Q. You were six hundred feet below the Presley? A. I have estimated it
about that distance, when I left the forecastle deck. Q. The Presley was
headed some out from the American side? A. Yes, sir. Q. And was under
headway? A. Yes, sir. Q. Your vessel was heading in towards the Ameri-
can side? A. Yes, sir. Q. And the river is how wide at that point? A. Oh,
about eighteen hundred feet from channel bank to channel bank. Q. And
you did not consider it necessary to stop? A. I didn't consider it safe to
stop there. Q. Why couldn't you have stopped there? A. To have stopped
my boat there, I should have to back her, and by backing her I would have
swung her broadsides across the bow of the Presley. Q. You backed her
later? A. Yes; when I had her in a different position. Q. You could back
her with more safety when she was up against the bank than you could
when she was away out in the river? A. I could when I had her stern
swung away out in the current. Q. What did you do on your boat the first
thing when you went on the pilot house, and the boats were in the position
that you have there indicated? A. I told the mate I would assume charge
of the boat. Q. Then what did you do? A. I asked the wheelsman how
his wheel was. Q. Then what did you do? A. I hard-starboarded. Q.
And then what did you do? A. I saw then it was necessary to get in on the
bank, as then I could see the Helvetia coming across, apparently across
the stern of the Johnson. Q. While you were doing all those things you had
come up to what place in that tow? Your boat was abreast of what part
of the tow? A. In about abreast of the Presley. Somewhere in that neigh-
borhood. Q. Was there as much as one-third of the channel between you
and the American channel bank at that time? A. Between us and the
American channel bank, one-third of the channel? Q. Yes; when you were
abreast of the Presley? A. No, sir. Q. How much was there? A. I would
not think we were over a boat length from the visible line of water to the

side of the Yakima. Probably a hundred feet from the channel bank. Q. I think you have told us between your boat and the Presley there was three hundred fifty or four hundred feet? A. Yes, sir; something like that. Q. And was it in that position you put your helm hard a-starboard? A. It was; yes, sir. Q. Does your boat answer her helm quickly? A. She is considered a good steering boat. Q. She was already on a swing, was she not, under a starboard helm? A. Swinging slowly when I took charge of the boat. Q. And you didn't stop at that time, because you didn't think it safe to stop? A. No, sir; my boat would not have been under control if I' had stopped in the current at that point. Q. Did the situation, in your judgment, call for any such measure as that? A. As what? Q. As stopping and reversing? A. Well, the situation, in my judgment— I done the only thing I could do, in my judgment. The Court: Suppose the question is put this way: Did the situation call for you to stop at that time, if it had been safe for you to do so? A. If it had been safe to stop without taking chances of dropping broadsides across the Presley, I should have stopped. My object was to stop the boat. Q. Did you check the boat at that time? A. No, sir; the boat was under check at that time. Q. Now, you rung her up very shortly, did you not? A. I rung her up when circumstances required it. Q. What circumstances required it, then? A. She was hanging logy on her, wheel close to the bottom. Q. Over against the American bank? A. Dragging over against the American bank in shoal water. I would like to ·have you take into consideration that one boat is coming down and the other coming up all the time, and they are getting pretty close together."

The only reason which is given for not stopping at this juncture is that he did not think he could do so without danger of dropping "broadsides across the bow of the Presley." The Yakima was then under check. She was loaded, and was ascending a current of 2½ miles. The duty rested upon her, as an ascending lone. steamer, to keep out of the way of the descending tow, and to stop if the situation became such as to require either to stop. The Galatea, 92 U. S. 439, 23 L. Ed. 727; The Mayumbra (D. C.) 21 Fed. 476; The Osceola (D. C.) 50 Fed. 326. We' are not at all convinced that under the circumstances the Yakima might not have been at least brought to a practical standstill before passing the Johnson. With the current she had to breast, and wholly unincumbered, it is not so probable that she would have come into collision with the Presley, from 200 to 300 feet on her starboard side, as to justify her in crowding between the turning tow and the American bank, so close at hand. Capt. Williams, on his own evidence, was then nearly or quite 600 feet below the Presley, and we are not at all satisfied that he might not have avoided all risk of collision by then stopping and reversing. As the sequel shows, the Helvetia was still heading across the river, and the Reddington still headed upstream, on a tight towline. He did not stop. He pushed on until nearly abreast of the Johnson, when, seeing the Helvetia coming out from behind the stern of the Johnson, and headed across the river, he rung up his engine and starboarded. It was probably then too late to have ·stopped and reversed.

For failing to stop and reverse at the time when Capt. Williams took charge of the Yakima's navigation, and when the Presley was still several hundred feet above the Yakima, the Yakima must be condemned as having contributed to the collision. Both vessels being at fault, the damages should be divided. The decree will be modified accordingly. ̄ Costs of appeal will be divided.