MITCHELL TRANSP. CO. v. GREEN et al.

GREEN v. MITCHELL TRANSP. CO.

(Circuit Court of Appeals, Sixth Circuit. January 6, 1903.)

Nos. 1,086, 1,087.

1. COLLISION—STEAMER MEETING TOW IN CHANNEL—CARE REQUIRED.
   A steamer passing free through a rather narrow channel, and meeting another vessel with tows, is bound to take into account the fact that such tows are likely to be somewhat unwieldy, and vary more or less in their several courses, and to guard against the danger, and keep out of the way, if she can without peril to herself.

2. SAME—EVIDENCE CONSIDERED.
   The steamer Susan E. Peck met the steamer Folsom, with the barges Mitchell and Nelson in tow, when passing up through the "Lime Kiln Crossing" in the Detroit river, an artificial channel 440 feet wide. After safely passing the Folsom and Mitchell port to port, as agreed by signal, the Peck came into collision with the Nelson, which was sunk. Held, on conflicting testimony, that the Folsom and her tows were at all times to the westward of the middle of the channel, and that the collision was due solely to the fault of the Peck, which, after passing the Mitchell on a port helm, starboarded to such an effect that, being 240 feet long, she swung so far across the channel that her bow was caught by the cross-current, and she was unable to correct herself before striking the Nelson.

3. APPEAL—ASSIGNMENT OF ERRORS—DISREGARD OF RULES.
   The circuit court of appeals will not, unless in exceptional cases, consider an assignment of errors in plain disregard of rule 11, which requires that it "shall set out separately and particularly each error asserted and intended to be urged," and when, in addition, the appellant's brief fails to comply with rule 24, requiring a reference to the pages of the record relied on to support each point.

Appeals from the District Court of the United States for the Eastern District of Michigan.

John C. Shaw, for Mitchell Transp. Co.
Harvey D. Goulder, for claimant Green.
F. H. Canfield, for underwriters.

Before LURTON, DAY, and SEVERENS, Circuit Judges.

SEVERENS, Circuit Judge. The case here presented under the two foregoing titles resulted from a collision between the propeller Susan E. Peck and the barge Nelson, occurring in the lower part of the Detroit river, whereby the Nelson was so greatly injured that she sank soon after, and the cargo was in large part destroyed. The collision occurred in a channel known as "Lime Kiln Crossing," an artificial cut opened by the government, 440 feet wide, about 2,500 feet long, and 19 or 20 feet deep. This channel is straight, running nearly north and south. Its central line makes an angle at either end of about two points, with the ranges on which the river is navigated above and below the cut. Two lighthouses, or "tripods" as they are called, one at the upper and one at the lower end of the cut, mark its western, or American, side. There are no distinctive marks defining its eastern, or Canadian, side. There are two ranges running through the channel,—one called the "Lime Kiln Crossing Range," having its lights below, and running through the center;

120 F.—4

and the other called the "Duff & Gadfield Range," having its lights above, and running seventy (70) feet east of the central range. This Duff & Gadfield range was an old range, which had been used before the cut was widened from 300. feet to its. present dimensions, and ran through the center of the old channel. The widening was made on the western side. On the morning of November 20, 1892, the propeller Susan E. Peck, a vessel 240 feet long, 38 feet beam, and having a draught of 15 feet 5 inches, laden with a cargo of coal, and on a voyage from Buffalo to Chicago, having left the waters of Lake Erie, was proceeding up the Detroit river; and, having passed along the east side of Bois Blanc Island, she straightened up into the channel of the Lime Kiln crossing. At about the time when the Peck was coming into the south end of the cut, the steamer A. Folsom, coming down, and having in tow the barges Mary B. Mitchell and the Nelson, in the order named, was entering the cut at the north end. The three vessels just named were each of nearly the same size, but not quite so large as the Peck. The steamers had already, while they were three-quarters of a mile or a mile apart, exchanged signals, by which they had indicated a purpose to pass port to port. The weather was clear. There was not much wind, and all the vessels were in sight of each other. As the steamers were coming into the cut, the Folsom repeated its signal of one blast, and the Peck responded with one. As the steamers approached, they were nearly head on. The Peck gave a blast. Each steamer turned somewhat to starboard, and they passed each other at a safe distance. As the Peck came by the Folsom, the Mitchell turned to starboard, and the Peck continued on her starboard course, passing the Mitchell at a considerably wider distance than that at which she had passed the Folsom, and then, turning to port, she advanced toward the Nelson until a collision became imminent, when her engine was reversed, and her helm put hard aport. This was too late, however. The stem of the Peck struck the side of the Nelson just abaft the port bow with such violence as to crush in her planking and timbers, and to roll her over to starboard. The Peck backed, turned out, and, passing under the stern of the Nelson, proceeded on her voyage, having received no substantial injury. Thus far there is no controversy about the facts; but within the limits of this general account there is considerable dispute about particulars,—that is to say, about the course of the Peck, of the Folsom, and the vessels in her tow, especially of the Nelson, the locations of the several vessels with reference to the sides of the channel, while on their courses, and the location of the place of collision. Many witnesses were examined, and the record is very full. The district judge found the Peck, the Folsom, and the Nelson all at fault, and condemned them to pay each a share of the damages to ship and cargo.

Ordinarily, this court would feel bound to pay much regard to the findings of fact by the judge in the lower court, when he has seen and heard the witnesses giving testimony; and would not disturb them except for clear error. But the reasons for that course are somewhat diminished in a case where, as here, the case was heard and determined years after the testimony was taken, and when original

impressions are likely to have been much faded, or altogether lost. Another thing which makes us pause in giving such weight to the findings of the lower court, proceeding doubtless from the circumstances just mentioned, is that the court fell into a misapprehension of the charge contained in the libel and of the trend of the libelant's proof in reference to the courses of the several vessels. In his opinion the learned judge says:

"The libel is framed upon the theory that the Peck, a steamer of 1,400 tons registered tonnage, 240 feet in length, 38 feet beam, and laden to a draught of 15 feet 5 inches, going up the river at a somewhat less speed than the tow was coming down. accomplished the feat of twice traversing diagonally two-thirds of the width of the channel, and came back at such an angle across the stream that she struck the stem on the bow of the Nelson while the latter was going straight down the river 300 feet at a somewhat higher speed than the Peck was going up; or, in other words, that the Peck, from abreast of the Mitchell's stem, ran the two sides of a triangular course, each about 250 feet long, across the cut, while the Nelson simultaneously moved straight down the river, at an equal or somewhat greater speed, 300 feet, on the third side of the triangle (i. e., half the distance between the Mitchell's stern and the Nelson's bow); that these evolutions were performed in about thirty seconds, the combined speed of the ascending and descending vessels being about thirteen miles an hour. This story needs no comment."

And again, in speaking of the libelant's proofs, he says:

"To bring about a collision in the manner depicted by the testimony of the libelant's witnesses would require not only an exceedingly quick handling vessel moving at double the speed of the tow, but the extreme throw of the wheel to starboard, and a change of course at fully eight points. Under the libelant's proofs, the vessels could not have come together unless the Peck approached the Nelson on a course which would take her nearly, if not quite, at right angles across the channel. The extravagance of libelant's proofs as to the movements of the Peck of necessity discredits their testimony as to another important feature of the collision, and that is the locality in the channel in which the vessels came together."

The libel reads as follows:

"The Peck came up at apparently full speed, and passed close on the port hand of the Folsom, then turned to the eastward some, so that she passed the Mary B. Mitchell, which was the first barge in the Folsom's tow, at a much greater distance away than she had passed the Folsom. After passing the Mitchell, the Susan E. Peck turned and wrongfully swung rapidly and broadly across the channel, and toward the westerly side thereof. The Nelson was well to the westerly side of the channel at the time, and her helm was put hard aport when the Peck swung to the westerly, as above shown. The Nelson thereupon worked further to the westward, and she was to the westward of the extreme westerly side of the cut or crossing (as the same is marked by the light boats) when the collision occurred."

The statement is that the Peck passed close to the Folsom, then turned to the eastward somewhat, passed the Mitchell at a much greater distance than she did the Folsom, and then "swung rapidly and broadly across the channel toward the western side thereof," where she struck the Nelson. To what extent the statement of the court in respect to the libelant's proofs corresponds with the fact, we shall have occasion to consider later on. The libelant complains—and, as we think, justly—that the court misapprehended the theory of the libel and the tendency of the libelant's proofs. Nothing so extravagant can be fairly said to be advanced by either. Upon its conclusion in regard to the testimony of the libelant respecting the courses

run by the vessels the court held that its witnesses were necessarily discredited in their testimony in respect to another important feature of the case, namely, the locality in the channel at which the collision occurred; and we cannot doubt, from what ensued, that the court disregarded the testimony of those witnesses in reaching its conclusion upon the latter fact, which, as the court rightly considered, was an important one.

Upon the same consideration must have rested the court's finding that the Nelson, just before the collision, was sagging down and across the channel on a slackened towline. This also is a matter we shall consider later. No new parties had been brought in, and no cross-libel had then been filed. The court found the Peck at fault in not sooner reversing her engine, when the Nelson was seen too far to the eastward, and also found the Folsom and the Nelson both at fault,—the former because she did not correct the position of the Nelson in the channel, and did not recognize the Peck's right to a fair share in the channel, and in crowding her into collision with the Nelson; and the Nelson for failing to take reasonable precautions against the effect of the current (meaning the current deflected across the channel at the upper end of the cut), and because she was permitted to take leeway to such an extent as to obstruct the safe passage of the Peck; and condemned all three to pay each an equal share of the damages, and a reference to a commissioner was ordered to ascertain the damages. A decree was entered accordingly on June 14, 1898. While this reference was pending, and on April 30, 1900, John Green, the owner of the Peck, was granted leave to file a petition, reciting that he had already answered the libel, and thereupon proceeding to state the circumstances of the collision, the freedom from fault of the Peck, the decree which had been rendered charging the Peck as well as the Folsom and the Nelson, the interest of cargo owners and underwriters, asserting the responsibility of the libelant for collision and damages, and praying "that this honorable court will be pleased to issue such appropriate process, or make such appropriate order in the cause as shall require the said libelant to be and become a party in this cause, answerable to any interest for which the libelant may sue as trustee, for the whole or any part of the damage sustained by any such other party or interest, to the end that the final decree to be framed in this cause shall exclude the libelant as a party bound to respond in the cause in accordance with the judgment of the court upon the law and facts of the case." But the leave to file this petition was coupled with leave for libelant to move to strike it from the files. Such a motion was made and granted July 11, 1900. Meantime several insurance companies interested in the Nelson's cargo had filed intervening petitions praying for the execution of the decree against the Peck, the Folsom, and the Nelson. July 20, 1900, Green, without leave of the court, filed another petition containing similar charges to those in his former petition in respect to the collision, the filing of petitions by other parties interested, and praying that the damages be charged to the libelant, and that the petitioner be exonerated. Motion was made by the libelant to strike out this petition, but the court withheld its decision until some time later.

On May 11, 1901, the court confirmed the commissioner's report, and overruled the exceptions of the libelant to Green's petition. Finally, after all this, and more, a final decree was entered, following, in substance, the former decree, and making certain adjustments not necessary to be now considered. The action of the court in permitting the proceedings which ensued after the entry of the interlocutory decree was entered and before the commissioner's report was confirmed and final decree entered, forms the subject of several assignments of error; but, as they do not becloud the main subject upon which we propose to rest our decision, and the libelant has received no injury therefrom, we find it unnecessary to decide what ought to be done in regard to the practice and proceedings complained of, and we withhold all criticism upon that subject.

Recurring to the main subject, we are of opinion that the court did not err in holding the Peck to be in fault, but we cannot agree to the conclusion that the Folsom and the Nelson were likewise chargeable. Upon an attentive examination of the whole of the testimony in the record, we reach, without much difficulty, the following conclusions, beginning at the point where the parties are in dispute. We think, as the court below did, that the steamers were proceeding through the channel of the Lime Kiln crossing on parallel courses, not far from the center, each on its own side,—the Peck on the eastern and the Folsom on the western side. As they approached each other, their bearings were a little too close, and upon a signal from the Peck they each ported a little, and passed each other on parallel courses; whereupon the Mitchell, which had been in line with the Folsom, ported also to about the same extent as the Folsom had done. The Peck again ported somewhat, and passed the Mitchell at a considerably greater distance than she had passed the Folsom, and then, thinking she was going too far off her course, turned westward on a starboard helm to regain it. The Nelson, which had been very nearly in line with the Mitchell, was at that moment turning to the westward to follow in the wake of the Mitchell. The Peck held too long on her starboard helm, and, her head encountering the deflected current running westward in the channel, of which she had not taken account, she was carried too far to the westward, and was unable to correct herself before she struck the Nelson. When she saw that collision was imminent, she immediately reversed her engine, and turned her wheel hard aport. The stem of the Peck struck the Nelson a little behind her port bow. The angle of the vessels at the moment of collision was nearly four points. The heads of the vessels were at that time turned to the westward; probably the Peck was most so. The Nelson had just been turning somewhat to get out of reach, and the Peck had just turned to the right somewhat, under her wheel hard ported. Both vessels were moving at nearly equal speed, that of the Peck being at the moment rather the less from her effort to stop. The side of the Nelson was crushed in, and she was rolled over to starboard by the blow, but her towline was not broken. From these latter circumstances we gather the probability that she was not so much turned westward as was the Peck. The Peck carried the head of the Nelson to the westward, and by this re-

sistance and the reversal of her engine, the Peck was stopped. Thereupon she backed out, turned to the right, and again to the left around the Nelson, and then proceeded up the channel. The Nelson immediately began to sink. She was taken by the Folsom to the first convenient place, and there taken over a level sandy bottom, where she was beached. There is no substantial ground for criticism in her management after the collision.

The grounds for these conclusions will now be stated. We may premise generally that they best accord with the probabilities arising from indisputable facts, and they reconcile, as nearly as they can be reconciled, the conflicting evidence. Moreover, they are supported by the great preponderance of testimony given by those who were in the best position to know the facts about which they testify. The captains of the Folsom, the Mitchell, and of the Nelson,—all of them men of long experience on the lakes and connecting rivers,—testify to the incidents of the occurrence as observed by them while managing their vessels and watching the events. The captain of the Folsom testifies that as he was coming down on the Canadian range he met the steamer Vulcan about half a mile above the cut, which steamer he passed on the starboard hand; and about the time of passing, seeing the Peck about a mile below, he gave her one blast of his whistle, to which the Peck responded with one blast; that he had already checked his speed to $4\frac{1}{2}$ or 5 miles an hour, going through the water, preparatory to going through the cut; that when he approached the cut, and had opened the tripods on the western bank nicely, he hauled down into the western part of the channel about 100 feet east of the upper tripod, and about the same time, seeing the Peck coming into the lower end of the cut, but not quite straightened up, he gave another blast of his whistle, which was answered by the Peck with one; that he kept on his course, having the lights of the central range open to the eastward, with good steerage headway; that he met the Peck about half way down the cut, coming up at about six miles an hour by the land; that she was heading pretty well onto him on the port bow; that the Peck blew a short toot, which he answered; that he ported a little, and the Peck also ported, and the vessels passed on parallel courses about 30 feet from each other; that as they passed the captain of the Peck hallooed for more room, to which he replied: "What the ——— do you want? You have got all the channel now;" and motioned with his hands to keep away, and himself starboarded some and steadied, and then went down the channel heading for the upper light of the central range; that, as the Peck passed the Folsom, she was headed toward the Mitchell; that the Mitchell kept up to the westward, turning on a port helm; that the Peck ran off to the eastward toward the Canadian side, but recovered herself, and came back, and had the appearance to him of going between the Mitchell and the Nelson; that, as the Peck started to come back, the Nelson, then on the western side of the channel, put her wheel to port, and came up quickly, and that the vessels collided near the upper tripod; that he saw the upper tripod while the vessels had their bows together right over the Nelson's bows forward of the foremast; that when he saw there

was going to be a collision he checked down and stopped; that he had not more than got checked before the vessels came together; that when the Nelson was struck she took a heavy roll to the westward, the Peck turned out and went on, and he started ahead as his towline came up. And he further stated that the Nelson's speed at the time she was struck was four or five miles an hour through the water, that she was a good steering vessel, and that she had no trouble in keeping up on her proper course.

We cannot, without going into too great length, exhibit all the testimony with so much particularity. It must suffice to say that, with some slight variations, mainly based on estimates, this narrative, with respect to the important facts, is confirmed by the testimony of the captains of the Mitchell and the Nelson, and by many other witnesses. The captain of the Mitchell states that he came down 60 or 80 feet from the upper tripod; that the Peck passed him 80 to 100 feet distant, and that while passing she starboarded, and went under the stern of the Mitchell; that he heard the order given on board the Peck, "Starboard, hard a starboard!" on which she turned westward; that when the vessels came together the Nelson's bow shut out the tripod from his view. The captain of the Nelson, who was 54 years old, and had sailed for 35 years (24 of which had been on these waters), states that he followed in the wake of the Mitchell all the way down, was in the western side of the channel, heard the passing signals given, but, not anticipating any trouble, did not notice the Peck particularly, until, when she had passed the Mitchell, he saw her crossing the channel as though on a starboard wheel; that he then put his own wheel hard aport, and went over to the westward; that the vessels came into collision near the upper tripod, some 60 to 75 feet distant, as he thought. When asked whether the tow was angling across the channel at and just before the collision, he answered:

"Well, I looked at the tow from where I was, and it looked as if the Folsom was a little more in the middle of the channel. She was the farthest in the middle of the channel of the three. The Mitchell was pretty near on a line with them, probably a little on the starboard quarter. I was also heading a little on his starboard quarter."

Some criticism is bestowed upon this witness because he did not pay more attention to the earlier movements of the Peck. But, as nothing had occurred to excite apprehension until the Peck started across the channel, and he was attending to his own duty, the criticism is hardly deserved. At all events, it is clear that, if he had attentively watched the Peck, there was nothing in her course to require any other course on his part than that he was pursuing, until the time when the Peck started over to the westward, and then he did what he could; but there was no escape. Other witnesses for the libelant were Lacquier, mate of the Folsom; Leach, the second mate of the Folsom; Elliot, the lookout; Hall, chief engineer; Burnett and Newell, wheelsmen; and several others of the crews of the Folsom and the vessels in tow; and they give the same account. Not all testify about all the particulars, but the trend of their testimony corroborates the testimony of the officers. Several witnesses from

the shore were examined on each side, but the testimony of most of them is not very precise or reliable, mainly on account of the positions they occupied. One of them, however,—the keeper of the government range lights for this channel,—was on the tower of the upper light, and had a peculiar advantage for observation; but he is shown to have accommodated each side with previous statements not in harmony, and there are some parts of his testimony which we believe to be incorrect. Another witness was the keeper of the government light on Colchester Reef, who was standing at the time on the dock at Amherstburg below and looking up the cut. He states that he saw the steamers passing port to port; that, after passing the Folsom, the Peck headed over to the eastward more than she was doing before, so that he saw her starboard side; that, soon after, she was heading to the westward more, and showing her port side; that she was then on a heading which, if continued, would have carried her onto the western bank; and that he could see her hull and port side at or just before the collision. He further gives reasons, from subsequent examinations of the locality of an object which he saw at the time of the collision, for his statement that the Nelson was on the westerly side of the channel when she was struck. We have stated the main points of this witness' testimony, because he was in a favorable position, saw the vessels from the time the steamers were passing, was disinterested, and his narrative gives a strong impression of its truthfulness.

The captain of the Peck was naturally the principal witness for the respondent. He was 32 years of age; had been on the lakes and rivers 17 years (9 of which he had been an officer on steamers). He testified that on the day of the collision the Peck had a draught of 15 feet 5 inches, and was a good handling vessel; that he was in the pilot house, in charge of the vessel; that while below the cut he exchanged signals of one blast with the Folsom, then above the cut, and not long after straightened up into the cut on the Duff & Gadfield range, which he knew to be 70 feet east of the center line; that at that time, thinking the Folsom was so far to the east that she would pass close, he blew a signal of one blast to the Folsom, to which she answered with one; that after this signal the Folsom appeared to hold up a little to the westward; that he continued up on the Duff & Gadfield range, but before getting abreast of the Folsom he saw the Mitchell sagging off to the eastward, and crowding down on him, and he blew a blast to her; that the steamers passed each other at a safe distance, about 70 feet apart; that the tow continued coming down in the same position, crowding him; that he worked his vessel more to the eastward, so as to pass the Mitchell; that when he was abreast of the Folsom he called out to her captain to blow to his tow to keep it off, and give more room, and that the Folsom did blow; that he began edging to the eastward when he saw the consorts sagging over to the center and getting nearly abreast of him; that his order was to "port a little, a very little, let her work a little more to the starboard"; that, after the Folsom blew the blast as he had requested, he noticed that the Mitchell was working to the westward, as if she had ported her helm, so that he saw they were

going to pass clear; that, when he got abreast of her, he blew to the Nelson, who was passing off to the eastward of the ranges altogether; that he passed the Mitchell's quarter not less than one nor more than two widths of his vessel (from 40 to 80 feet); that when he was abreast of the Mitchell he felt his boat touching the bottom along the starboard bilge; that he was then just a little to the east of the Duff & Gadfield range; that the Nelson had commenced to swing, and he could see her swinging, and he thought there was no danger from her; that he then starboarded a little, so as to bring the Duff & Gadfield range almost ahead, having the lights just a trifle open to the eastward; that he steadied on that course, and noticed the Nelson all the time swinging to the westward on a port helm; that soon he could see she was not head-reaching, but was sagging down; that he then gave the order to put the helm hard aport, and signaled to stop, and back strong; that at the time of collision his boat was stopped; that the vessels came together at an angle of 2 to 3 points, —nearer 3 than 2,—and that the Nelson was driven to starboard; that the place of collision was 350 feet from the western side of the channel, and 800 feet below the upper end of the cut. The witness further stated that at the time of the collision the Nelson was to the westward of him, nearly ahead of him, "nearly at right angles." We presume he means just before the collision, as he had already given the angle at two to three points. He says he did not notice the tripod; that when he steadied on the Duff & Gadfield range, just before the collision, when he came back from the east, he headed for the place from which the Nelson was coming; that the Nelson had headway of her own independently of the current; that when he struck her her bow was carried further westward, and more across the stream, and that he passed around her quarter without touching her. He also states that when he steadied on the Duff & Gadfield range, after coming by the Mitchell, the Nelson was off his port bow, her quarter bearing almost ahead, a "little bit to port," and that he "believed the way she was heading she was going way off clear of" him. The mate, the cook, and the two wheelsmen of the Peck were sworn, and they gave some rather indefinite confirmation to her captain's narrative.

The opinion of the district court was that the steamers went through the cut, the Peck on the Duff & Gadfield range and the Folsom on the Central, or Government, range, which the court found was usual and prudent navigation. Perhaps this was true of the general course of the Peck up to the time when she came back after passing the Mitchell. But the decided preponderance of the evidence is that the Folsom and her tow were all the while somewhat west of the Central range, though we think their general course was not much west of it. The unmistakable facts tend strongly to support the case of the libelant. The account given by the captain of the Peck of his course up to the time he came to the westward on his starboard wheel need not be much criticised, though we think his speed was greater than he states, and we are of opinion it was too great for the navigation of a steamer in meeting a tow in a place requiring great prudence and circumspection. Being freehanded, she could easily

manage herself, and in doing this she was bound to consider that the
steamer and tow she was meeting must, in the nature of things, be
somewhat cumbersome and unwieldy, and that some variation in their
several courses were likely to occur.  Being master of her own mo-
tions, she was bound to guard against these, and keep out of the way
if she could without peril to herself.  The George Presley, 49 C. C.
A. 438, 111 Fed. 555; The Syracuse, 9 Wall. 672, 675, 19 L. Ed.
783; The Mayumba (C. C.) 21 Fed. 476.  We think there were no
greater variations in the present instance than might reasonably be
expected to occur.  With respect to the sagging of the Nelson, the
weight of the evidence is opposed to the charge; that is to say, it is
opposed to the charge that there was any more sagging than would
ordinarily result from her passing in tow through that portion of the
cut in the usual way.  If the currents there would produce some va-
riation, it was to be anticipated, and no fault could be imputed unless
she omitted to take precaution against an excessive departure, such
as might endanger the safety of the vessel coming up the channel;
and in such case she had a right to expect that the Peck would take
account of the conditions there, and govern herself with reference to
them.  And it would seem reasonable to think the vessel and tow
would have a fair claim to the larger portion of space for its move-
ments.  Moreover, the proof shows without contradiction that the
Folsom kept her speed from the time she checked to go through
the cut until the moment before the collision, when she stopped to
ease the blow.  It is not shown that the Nelson was faulty in han-
dling, or that the proper measures were not taken to assure her pru-
dent navigation.  The captain of the Peck says that she seemed to
be answering her helm, and to be coming up under it, so that he ex-
pected she would get clear off out of the way.  There is grave im-
probability that with good steerageway on the part of the Folsom,
pulling her down by the head and her helm put to port, she drifted
down sidewise, and we must discard the suggestion as not proven.
The account given by the captain of the Peck of what happened from
the time he started to come back from his course to the eastward
is hard to understand, and it is burdened with improbabilities.  To
begin with, we are doubtful about the suggestion that the Peck
touched bottom, and that this warned her captain to go to the west.
The vessel was drawing only 15 feet 5 inches and the channel had
a clear depth of 19 feet.  The eastern side was cut straight down,
and the captain of the Peck rejects the idea that he went near enough
to the bank to take a sheer.  The presence of a rock out in the chan-
nel projecting high enough to strike the bottom of a vessel of the
draught of the Peck in a channel so much frequented is surprising.
No mention of such an incident is made in the answer of the Peck,
and there is no proof that such a dangerous obstruction existed there.
The captain says that after he came back, and got about on the Duff
& Gadfield range, and steadied, he had the quarter of the Nelson
a little on his port bow; that she was lying across the channel, but
appeared to be coming up on her port helm; that he soon saw that
she was not head-reaching; that he immediately reversed his engine,
but struck the Nelson abreast of her fore rigging at an angle of

nearly 3 points at a place 350 feet from the western side of the channel. The Nelson was only 600 feet behind the Mitchell. There must have been some space between the Mitchell and the Peck when the latter steadied, and the Peck was 240 feet long. By this account the Peck was not much more than her length from the Nelson when she steadied on a course 150 feet from the eastern side of the channel, and came into a collision with the Nelson nearly 200 feet forward of her stern at a place 60 feet east of the Peck's course. The story sounds like one told in extremities, and is incredible. It deprives us of any substantial foundation on which to rest a valid defense.

The evidence shows that the steamers first signaled each other at a considerable distance from the crossing, indicating that they would pass to the right of each other, and that they repeated the signals as they came into the cut. The captain of the Folsom says that he inaugurated these signals. The captain of the Peck says that he gave the first signals. The district court, accepting the Folsom's statement in this regard, drew an inference that the Folsom's second signal was given because her tow was further to the eastward than usual, and was intended to notify the Peck that, notwithstanding the appearances, she intended to pass to the right. But we think this inference is not justifiable. To begin with, the signal would no more indicate an erroneous position of the tow than that the Peck was seen below entering too far to the west in the channel. But, aside from this, we think those second signals indicated merely the caution which the entrance upon a somewhat delicate period of navigation required. The first signals were preliminary, and, if not changed, might doubtless be relied upon. But they were subject to change if, before entering upon the final course, occasion should require. The rules of navigation respecting signals have a qualified application to vessels going on the frequently varying courses of rivers. Doubtless they should be followed as nearly as possible, and the obligation becomes still more imperative when they come upon the final course on which they intend to pass. By the twenty-third of the rules governing the navigation of the Great Lakes and connecting waters, it is declared that one blast means that "I am directing my course to starboard," and we must think that as the steamers approached each other in this strait the captains would naturally, in their anxiety to make sure of their understanding, signal their final purpose.

It is imputed to the Peck that she was a bad steering vessel, and there is evidence in the record bearing upon that subject. The district judge held that the charge was not made out, but we have not found it necessary to pass upon that question.

Guided by what we must regard as proven by the weight of the positive testimony, as well as the probabilities arising from facts about which there can be no dispute, we are unable to find any fault in the conduct of the Folsom upon which to rest a judgment against her. The grounds on which she was held by the district court were that she was responsible for the supposed faulty position of the Nelson, and that she did not give the Peck her fair share of the room, and crowded her into collision with the Nelson. The speed of the

Folsom, as being too fast or too slow, is not complained of. She maintained her speed, as she was bound to do, until the danger appeared, and then it was so imminent that nothing could be done except by checking down and stopping so as to mitigate the blow, and this she did. Her course down the channel was admitted by the district 'court, and, as we believe, to have been proper. Her tows were neither of them in the way of any proper navigation of the Peck, and there remains no other charge of fault. For like reasons, we are of opinion there is no valid ground for charging the Nelson. She was at all times in a position of safety, and would not have collided with the Peck if the latter had been properly handled. For the reasons heretofore stated, we think the Peck was clearly at fault, and that, but for such fault, the accident would not have happened. And upon this conclusion, if it were necessary to have regard to it for that purpose, the burden of the proof is cast upon the Peck to show by clear and indubitable testimony the fault of the other vessels which she seeks to draw in to share her responsibility. The City of New York, 147 U. S. 72, 85, 13 Sup. Ct. 211, 37 L. Ed. 84; The Ludvig Holberg, 157 U. S. 60–71, 15 Sup. Ct. 477, 39 L. Ed. 620; The Iron Chief, 11 C. C. A. 196, 63 Fed. 289, 292.

The decree of the court below must be reversed as to the Folsom and the Nelson, and modified as to the Peck, so as to hold her alone responsible.

### Supplemental Opinion.

#### (February 14, 1903.)

PER CURIAM. The original opinion of this court in this cause overlooked an assignment of error alleged by the appellant the Mitchell Transportation Company, to which our attention has been called and which reads as follows:

"The court erred in not sustaining the first, second, third, fourth, fifth, seventh, eighth, ninth, and tenth of libelant's exceptions to the report of the commissioner filed in said cause."

These several exceptions were taken to the disallowance by the commissioner of each of several items of damage alleged by the libelant against the Peck. The above stated assignment is in plain disregard of the eleventh rule of this court (31 C. C. A. cxlvi, 90 Fed. cxlvi), which requires that the assignment of errors "shall set out separately and particularly each error asserted and intended to be urged," and further declares that, "when this is not done, counsel will not be heard, except at the request of the court, and errors not assigned according to this rule will be disregarded, but the court at its option may notice a plain error not assigned."

Rule 24 (31 C. C. A. clxiv, 90 Fed. clxiv) also requires that the brief of counsel shall exhibit "a clear statement of the points of law or fact to be discussed, with a reference to the pages of the record * * * relied upon in support of each point." The references to the record in the brief of the libelant to the pages of the record, which consists of more than 900 pages, are meager and wholly insufficient to present the questions to which the exceptions referred to relate. The task is imposed upon the court of a laborious search of the record to

gather the materials necessary to an intelligent consideration of the points presented. The assignment of errors above quoted is therefore not sustained.

The decree of the district court will be modified only to the extent necessary to conform to the opinion of this court, and interest will be allowed from the date of the said decree as therein allowed.