NATIONAL STEEL CORPORATION, a corporation, Plaintiff-Appellee-Appellant, (73–1687)

v.

BUCKEYE STEAMSHIP COMPANY (KINSMAN MARINE TRANSIT COMPANY), a corporation, Defendant-Cross Complainant-Appellant, (73–1686)

and

BIBBY LINE, LTD., a corporation, Defendant-Appellee.

Nos. 73–1686, 73–1687.

United States Court of Appeals, Sixth Circuit.

Argued Dec. 6, 1973.

Decided Feb. 13, 1974.

Fenton F. Harrison, Buffalo, N. Y., for Kinsman Marine Transit Co.; Lee C. Hinslea, Harrison, Gruber & Gaughan, Buffalo, and Victor G. Hanson, Detroit, Mich., on brief.

John Arthur Hamilton, Detroit, Mich., for Bibby Line, Ltd.; Foster, Meadows & Ballard, Detroit, Mich., on brief.

Thomas O. Murphy, Cleveland, Ohio, for National Steel Corp.; Henry B. Bruner, Johnson, Branand & Jaeger, Cleveland, Ohio, Robert A Jenkins, Scholl, Jenkins, Robinson & Stieg, Detroit, Mich., on brief.

Before CELEBREZZE and LIVELY, Circuit Judges, and WILSON,* District Judge.

LIVELY, Circuit Judge.

This admiralty case arose out of a collision between the Great Lakes freighters James E. Ferris and Ernest T. Weir which took place in the St. Clair River below Port Huron, Michigan. The collision took place in an area of the river where the British ship Toronto City was maneuvering. The facts are fully set forth in the opinion of Senior District Judge Talbot Smith, which is reported at 369 F.Supp. 498 (E.D.Mich. 1973), and will not be repeated here. On appeal a great deal of time in argument and space in the briefs has been devoted to disputing the factual findings of the district court and seeking to have this court determine the weight of the evidence. In his comprehensive opinion, Judge Smith made this statement:

> We observe, before getting into our findings and conclusions, that the record is a mass of contradictions. Witnesses differ as to the times of critical occurrences, the locations thereof, the distances between the vessels themselves, and between the vessels and shore locations. Messages assertedly sent are not received and, when received, vary between the parties as to their content. In view of the pre-dawn darkness, the fact that many of the observations made involved estimates from running and range lights, as well as shore lights and structures, plus the lack of synchronization between timepieces on the various vessels, as well as the stress and strain of the crisis ultimately presented, the variances in the various accounts are not entirely unexpected. In this situation we have relied strongly on certain physical

---

* The Honorable Frank W. Wilson, Chief Judge, United States District Court for the Eastern District of Tennessee, sitting by designation.

facts and upon our observations and appraisals of the attitudes and demeanors of witnesses, as well as of the content and reasonableness of their various assertions.

The findings of the district judge who has the opportunity to see and hear the witnesses in an admiralty case will not be set aside unless clearly erroneous. Federal Insurance Co. v. S.S. Royalton, 312 F.2d 671 (6th Cir. 1963). We have reviewed the evidence heard by the district court and conclude that its findings are not clearly erroneous. Rather they are supported by competent evidence of strong probative force. The district court held the Ferris to be solely at fault. We affirm.

■ In its brief on appeal, the Ferris states that it "is prepared to accept the findings of the court below that she was navigating the St. Clair River at an excessive speed under the circumstances and failed to timely check before approaching the gap astern of the TORONTO CITY." It is asserted, however, that the fault of the Ferris in failing to check her speed was minor in comparison to the faults of the Weir and the Toronto City. This does not comport with our view of the collision, nor that of the district court.

If the Toronto City took longer to make her turn than the Ferris had expected and if this delay created reasonable apprehension in the minds of those in charge of the Ferris about its ability to pass under the stern of the Toronto City and then complete a port-to-port passing with the Weir, the Ferris had an increased responsibility to advise the other two ships of its apprehension. Nevertheless, the Ferris continued to come toward the turning Toronto City at an excessive speed and never attempted to warn the Toronto City that its slow turn was creating a hazard, either by sounding a danger signal or by radio contact. Furthermore, after the Ferris had momentarily lost sight of the Weir because of the swing of the Toronto City between them and then regained visual contact, it confirmed its previous port-to-port passing agreement with the Weir by returning a one-whistle blast signal without in any way indicating that danger of a collision existed. If there were "special circumstances" as contended by the Ferris, these circumstances and their possible results were much more obvious to her than to either of the other two ships. Yet she elected to continue as before. If she had alerted the other two ships to her danger, one or both might have been able to take steps which would have remedied the situation.

■ The Ferris seeks to have us hold that the movements of the Weir were negligent and that the district court erred as a matter of law in finding the Weir free of fault. The Ferris would have us require the Weir to back her engines and come to a complete stop if necessary and blow a danger signal, primarily because she (the Weir) was upbound and therefore the burdened vessel. This argument loses sight of the fact that the Weir at all times was downstream from the place where the Toronto City was making her turn and, in fact, never reached the Toronto City. The collision between the Ferris and the Weir took place approximately one ship's length (500–600 feet) downstream from the place where the Toronto City was making her turn. The Weir checked her speed twice after learning of the turning maneuver contemplated by the Toronto City and the election of the Ferris to pass under her stern, and also changed her course several times to move closer to the Canadian shore which lay on her starboard side. At the time of the collision the Weir was less than 100 feet off the end of the C & O dock on the Canadian side and was making bare steerageway through the water. Since the Ferris had never advised the Weir that she was embarrassed by the movements of the Toronto City, but had reaffirmed a passing agreement with

the Weir as she (the Ferris) passed under the stern of the Toronto City there would be no justification for requiring the Weir either to back her engines or sound a danger signal. By the time there was any reasonable expectation of a collision in the minds of those in charge of the Weir, it was too late to avoid it by either of these steps.

■■ A ship to whom an existing danger is as clearly and immediately obvious as to another vessel cannot rely on the failure of the other vessel to sound a danger signal as a basis of contributory fault. The Queen City, 189 F. 653 (E. D.Mich.1910), affirmed sub nom. Cambria Steamship Co. v. Pittsburgh Steamship Co., 212 F. 674 (6th Cir. 1914). A case which is similar to the present one in many respects is Lake Erie Transportation Co. v. Gilchrist Transportation Co., 142 F. 89 (6th Cir. 1906). There the collision was almost avoided and the glancing blow would not have occurred if either ship had succeeded in moving a few feet further to its side of the channel. The downbound ship which failed to avoid the collision by maneuvering sought to put the blame on the other ship for not stopping. This court held that the upbound ship was not bound to anticipate that the vessel it was meeting would fail to comply with her agreement. So long as there was a reasonable opportunity for the downbound vessel to clear, the upbound vessel had a right to assume that she would do so. This rule should be particularly applicable in the present case where the Ferris, though privileged, confirmed the passing arrangement with the Weir at a time after the Ferris admitted having some concern about the turn of the Toronto City.

The appellant says that the two cases discussed in the previous paragraph, which were relied upon by the district court, are not in point, and that the court should have followed The George Presley, 111 F. 555 (6th Cir. 1901), and The Mary C. Elphicke v. Pittsburgh Steamship Co., 123 F. 405 (6th Cir. 1903). *The George Presley* involved a collision between the upbound Yakima and the second vessel in a three-vessel tow being pulled by the Presley. The Yakima was held to have contributed to the collision because she held to her course and tried to pass as previously agreed even though she realized that the tow was *out of control* and not turning properly. That case is easily distinguished from our present one because there was no evidence upon which it could be held that the master of the Weir either did or should have realized that there was danger of a collision with the Ferris in time to have prevented it. Even if such apprehension had occurred on the Weir it would have been dispelled when the Ferris repeated its agreement to pass port to port, since the slow movement of the Toronto City is the only thing alleged by the Ferris to have created a condition of peril. In The Mary C. Elphicke v. Pittsburgh Steamship Co., *supra,* there was a port-to-port passing agreement in broad daylight in a channel 1,000 feet wide. After the agreement both ships continued at full speed. The court found that the upbound vessel had plenty of room and time in which to avoid the collision after the danger began to be apparent to her. She realized that the downbound vessel was out of her proper place and refused to vary her own course. In these circumstances the upbound vessel was held to have contributed to the collision. In the instant case, of course, the Weir did vary her course to starboard at least twice after entering into the passing agreement and her bow was pointed toward the Canadian shore at the time of collision.

Appellant also cites American Steamship Co. v. Interlake Steamship Co., 208 F.2d 439 (2d Cir. 1953), for the proposition that the upbound vessel should be held to have contributed to the collision for failing to avail herself of her ability to hold back and keep out of the way of the downbound vessel. That case concerned a collision which took place in the St. Clair River not far from the location

of the collision in this case. However, the court found specifically that the upbound vessel could have moved closer to the Canadian shore without danger and instead that she moved to the left and continued her left swing right up to the point of collision. In the present case, it is undisputed that the Weir was "digging for the Canadian shore" and she certainly never moved to the left at any time between her passing agreement with the Ferris and the collision. Also cited is Morrow Steamship Co. v. The Daniel J. Morrell, 90 F.Supp. 300 (E.D. Mich.1949), affirmed sub nom. Cambria Steamship Co. v. Morrow Steamship Co., 182 F.2d 347 (6th Cir. 1950). In that case it was held that an upbound vessel in the Detroit River on a port-to-port passing agreement contributed to a collision with a downbound vessel by not sounding a danger signal although a setting for a collision confronted her master. There the master of the upbound vessel testified that he relied on the original passing agreement and kept his course and speed even when he became aware of the fact that the downbound vessel was making a maneuver which would occupy most of the channel and that this created a danger of collision. Of course, in the present case, the Weir had checked her speed and altered her course to starboard as a precaution prior to the time that there was any warning that a setting for a collision confronted her. The district court was justified in finding that neither the failure of the Weir to sound a danger signal nor to come to a complete stop contributed to the collision.

Both the Weir and the Ferris have sought to hold the Toronto City responsible, either solely or contributorily, for the collision. However, under the findings of fact which we have accepted, the Toronto City was free of fault.

The judgment of the district court is affirmed. The appellant Buckeye Steamship Company will pay the costs in No. 73–1686, and the appellant National Steel Corporation will pay the costs in No. 73–1687.