## THE ELIZABETH JORDAN.

## THE BURLINGTON.

## THE GRAMERCY.

### Nos. 274–276.

Circuit Court of Appeals, Second Circuit.
March 6, 1933.

Otto & Lyon, of New York City (Henry E. Otto, of New York City, of counsel), for libelant-appellee Canada Atlantic Grain Export Co., Inc.

Brown, Ely & Richards, of Buffalo, N. Y. (John B. Richards, of Buffalo, N. Y., of counsel), for Rutland Lake Michigan Transit Co.

Single & Hill, of New York City (Thomas H. Middleton and Christopher E. Heckman, both of New York City, of counsel), for appellant.

Before L. HAND, SWAN, and CHASE, Circuit Judges.

CHASE, Circuit Judge.

The steamer Burlington, owned and operated by the Rutland Lake Michigan Transit Company, was in collision with the barge Elizabeth Jordan, loaded with grain and in

tow of the tug Gramercy in the Niagara river on May 17, 1929. The steamer and the barge were both damaged. The grain was taken to Buffalo and transshipped.

Patrick Jordan, owner of the Elizabeth Jordan, and as bailee of the cargo, filed a libel against the Burlington. The claimant of the Burlington impleaded the Gramercy. The owner of the Burlington filed its libel against the Gramercy. The Canada Atlantic Grain Export Company, Inc., owner of the cargo on the Elizabeth Jordan, filed its libel against the Burlington, which impleaded the Gramercy. The Gramercy was held solely at fault. From a decree for Patrick Jordan against the Gramercy for the damages sustained by the Elizabeth Jordan and dismissing his libel against the Burlington; from a decree for the Rutland Lake Michigan Transit Company against the Gramercy; and from a decree for Canada Atlantic Grain Export Company, Inc., against the Gramercy; the Conners Marine Company, Inc., owner of the Gramercy, appealed. These appeals were consolidated and heard together.

The Gramercy, with four loaded grain barges closely coupled in two tiers of two boats on two hawsers from 100 to 125 feet long, was bound down the Niagara river from Buffalo to New York. The Elizabeth Jordan was the port barge in the second tier. The length of the tug and tow was about 400 feet. The weather was clear. She started down the river in the forenoon and, after clearing the government lock, had before her a straight course for about a mile where the channel is approximately 400 feet wide. This channel extended to the bank on her starboard and was marked by buoys on her port hand. At the end of the straightaway about a mile ahead and at a point near buoy No. 12, the channel turned to port at the beginning of another straight course. About the time the Gramercy turned down the channel, the lake freighter Burlington, two hundred and forty-five feet long, with a beam of forty-two feet, loaded with pig iron, turned the bend at buoy No. 12 bound up the river. The Burlington then blew one blast and kept close to her starboard side of the channel at half speed against an adverse current of about three miles per hour. The Gramercy heard the signal, but did not reply at least for several minutes, when she blew one whistle to which the Burlington replied with one and went to slow speed ahead. When the Gramercy blew, she was a little over half a mile from the Burlington, and, though she was either in the middle or a little to her starboard side of the channel, her tow was tailing

off to her port side. There were no other boats in the channel. Both the Burlington at slow speed and the Gramercy without slackening kept on without additional signals until they approached a point opposite buoy No. 18 and were about a quarter of a mile apart. Then the Burlington went to full speed astern as it appeared that the Gramercy would not pull her tow to her starboard in time to avoid a collision. Not far below buoy No. 18, the Elizabeth Jordan and the Burlington came into collision close to the west, or Gramercy's port, side of the channel. The port anchor of the Burlington struck the Elizabeth Jordan about amidships on her port side and scraped until the barge cleared. Then the Burlington, going outside No. 18, was fortunate enough to find water sufficient to enable her to navigate back to her course in the channel and on to Buffalo. The damage to the Elizabeth Jordan was practically all above the water line. Though a surveyor reported that she was unseaworthy, her owner insisted that she carry her cargo to New York. At the request of the cargo owner, however, and upon payment of the freight in full, the barge was taken back to Buffalo where her cargo was transferred to another boat in which it was carried to New York. On transshipment at Buffalo, only two bushels of grain were found to be damaged, and there were only eight bushels short.

Rule 24 of the Great Lakes Rules (33 USCA § 289) provides that:

"In all narrow channels where there is a current, and in the rivers Saint Mary, Saint Clair, Detroit, Niagara, and Saint Lawrence, when two steamers are meeting, the descending steamer shall have the right of way, and shall, before the vessels shall have arrived within the distance of one-half mile of each other, give the signal necessary to indicate which side she elects to take."

By blowing about a mile away, the Burlington indicated her choice of the passing. It is claimed that the rule above quoted gave the right of election to the Gramercy, as she was the descending vessel, and with that we agree. The action of the Burlington, however, did not deprive the Gramercy of this right. She still had time and opportunity within the rule to make her own choice, and we think she did. There was about a mile of water between the vessels. The Gramercy could have indicated her refusal to make a port to port passing and then blown for one starboard to starboard. See rules 23 and 26 of the Great Lakes Rules. Instead, she ignored the Burlington's signal for several minutes and then

blew one blast herself, which was answered by the Burlington, and so a port to port passing was agreed to in ample time and apparently to the complete satisfaction of all concerned. It was not carried out successfully because the Gramercy failed to keep her tow in line and on her starboard side of the channel. The evidence leaves some doubt of the captain's actual knowledge that his tow was tailing over as far as it did. But he should have known that whether he did or not, and it is but fair to say that the record discloses no reason why he could not have kept the tow over in his own water. That the navigator of the Burlington was put in a difficult position is obvious. That vessel had but a few feet of navigable water on her starboard; she could see the tow approaching at an angle which would bring on a collision unless the Gramercy pulled her tow toward the east bank; she was so near the edge of the channel that backing was hazardous, and she might well believe that the Gramercy, at least until the time when the Burlington did reverse, would pull her tow over where it ought to have been. In other words, the Burlington did her part to carry out the port to port passing which had been agreed upon and waited for the Gramercy to do hers until it was seen that she would not. It was then that the Burlington reversed, and we do not think she was at fault for failing to do so sooner. She had the right to rely on the agreement, and the apparent ability of the Gramercy to make a safe port to port passing and was not called upon to navigate on the assumption that the tug would be negligent and create the unnecessary risk of collision. See Lake Erie Transp. Co. v. Gilchrist Transp. Co. (C. C. A.) 142 F. 89; The Victory, 168 U. S. 410, 18 S. Ct. 149, 42 L. Ed. 519; Belden v. Chase, 150 U. S. 674, 14 S. Ct. 264, 37 L. Ed. 1218; The Servia, 149 U. S. 144, 13 S. Ct. 817, 37 L. Ed. 681. Despite serious doubt as to whether the appellant was entitled on the pleadings to a review of the issues presented, we have considered them and agree with the District Court that the Gramercy was solely at fault.

■ It is now urged that the District Court was in error in allowing the owner of the grain on the Elizabeth Jordan to recover the freight paid for the voyage and the cost of transshipment at Buffalo on the ground that the shipper voluntarily terminated the voyage and discharged the carrier from liability. See Barrell v. The Mohawk, 8 Wall. (75 U. S.) 153, 19 L. Ed. 406; The Lewis H. Goward (D. C.) 34 F.(2d) 791. This point was not raised below, however, and was not assigned as error. Compare The Asfalto (C. C. A.) 51 F.(2d) 982; Pendleton Bros. v. Pearce (C. C. A.) 10 F.(2d) 692. In view of the provisions of the contract of affreightment relating to the payment of carriage charges and the finding that the barge was unseaworthy after the collision, the error, if any, is not so plain that we will, without assignment, consider the point for the first time on appeal.

Decrees affirmed.