**300**

**MORROW S. S. CO. v. THE DANIEL J. MORRELL et al.**

**THE ROBERT J. PAISLEY.**

No. 7010.

United States District Court,
Eastern Dist. Michigan.
Southern Div.

July 8, 1949.

Foster & Lutz, Detroit, Mich., Johnson, Branand & Jaeger, Cleveland, Ohio, for libelant.

Richard A. Forsyth, Detroit, Mich., Russell V. Bleecker, Cleveland, Ohio, for respondent-claimant.

KOSCINSKI, District Judge.

### Findings of Fact.

1. On September 28, at about 11:00 P.M., the freight steamers Robert J. Paisley and Daniel J. Morrell, both light, collided in the waters of the Detroit River between the upper end of Belle Isle and the lower end of Peche Island.

2. The Paisley, 414 feet in length, after completing the unloading of its cargo of coal on the Water Works docks on the Detroit side, in the north channel of the river, was returning to Sandusky, Ohio. Her projected course was downbound, as she proceeded in an easterly direction in the north channel, then making a right turn around the upper Belle Isle lighted Junction Buoy, to proceed down the south channel of the river.

3. About the time The Paisley was leaving the Water Works dock, the Morrell, 600 feet in length, was upbound in the center of the south channel of the Detroit River between Belle Isle and the Canadian shore, in the middle of the south channel. She was bound for a Lake Superior port.

4. The Paisley and The Morrell sighted each other when more than 6000 feet away from each other, over the navigable waters. Each claimed to have been the first to sound the one-whistle blast, port-to-port passing signal. This is not significant, however, in the circumstances presented here. A port-to-port passing was agreed upon when the vessels were considerably more than a mile apart, and at a time when danger of collision was not present. The Morrell was then passing the Belle Isle light which marks a bend northeastwardly in the channel bed, while The Paisley was still in the north channel and about 1500 feet northwesterly from the Junction Buoy.

5. Following the passing agreement, The Morrell negotiated the northeasterly bend in the channel, continuing upbound at nine miles an hour, while The Paisley proceeded on its course to negotiate the right turn around Belle Isle Junction Buoy at three to four miles per hour.

6. The collision occurred in less than two minutes following The Paisley's attempt at the right-rudder turn in the narrow channel of 900 feet in width, marked on one side by the white flashing Junction Buoy and on the other side by the Peche Island light.

7. The weather was fair, there was little wind, and visibility was good.

8. Captain Aston, Paisley's master, and other members of her crew, testified that The Morrell was 75 to 80 feet on The Paisley's side of the channel, when the distance between the two vessels was yet 1600 feet. Although there was a vigorous denial by the captain and others on The Morrell that she occupied any portion of The Paisley's side of the channel, the evidence as a whole seems to bear out these assertions on the part of the libellant. Notwithstanding the risk of collision involved in such a situation, The Paisley continued on her way, without taking any measures to avert the disaster which was then probable. She failed to slacken, stop, drop anchor, or reverse her engines, nor did she sound a danger signal. Had she taken these mandatory precautions the collision could have been averted, even though the Morrell maintained her course and speed in the inexcusable reliance on Paisley's ability to make the short turn in the narrow channel, with the Morrell occupying a portion of it at the same time.

9. The Paisley's master, in attempting to negotiate the right-rudder turn, in close proximity to the Junction Buoy, had the choice of executing one of two maneuvers in making the turn, under the circumstances then existing: (1) He could slow down or wait for The Morrell to pass him; or (2) he could proceed eastwardly in the north channel one to two thousand feet, somewhere in the vicinity of Windmill Point Light where the channel is 2000 feet, and there make the turn. He could make the short turn around the white-flashing Junction Buoy in the narrowest part of the channel, directly around and ahead of the Junction Buoy, only if the circumstances were such that no risk of collision would be involved with another vessel in the narrow channel at about the same time.

10. The Paisley, more than 400 feet in length, could not make the abbreviated turn at right angles like an automobile in such close quarters. She needed a wide radius to make this short turn, and at the angle at which she was turning she must have necessarily occupied the greater part of the 900-foot channel in negotiating her right-rudder turn. She should never have attempted this short turn when her captain knew at all times that he would have to reckon with The Morrell's presence in the narrow channel at about the time the turn was attempted.

11. The master of The Paisley proceeded to make the short turn around the Junction Buoy—with disastrous results. His vessel was caught in the current of two to three miles an hour after he attempted to turn on right rudder, with his engines full speed ahead, causing The Paisley to move

astern and drift helplessly, broadside against the Junction Buoy, and to sag bodily downstream. In the maneuver his ship's position was directly athwart the 900-foot channel, and nearly at right angles to The Morrell, when The Morrell was only from 100 to 200 feet away. A last-moment reversal of her engines and efforts of about 90 seconds' duration at backing The Paisley to keep out of The Morrell's way, were of little effect.

12. No danger signal was sounded by The Paisley at any time, although her master should have realized that a setting for a collision was confronting him. His ship was heading directly into the path of The Morrell which was continuing on its course with speed unabated. When collision was unavoidable, The Paisley was put on a hard left rubber and full speed ahead, to lessen the impact. Paisley's master testified that he realized the danger of collision only when The Morrell was but 100 feet from him, at which time The Morrell was belatedly sounding a danger signal, dropping anchor, and reversing her engines. In a matter of 90 seconds there was an impact between the Morrell's stem and the starboard forward side of The Paisley.

13. The Morrell's master, Captain Colson, testified that while still keeping his course and speed of 9 to 10 miles an hour, and while he was yet 600 feet below the Junction Buoy, he determined that there was danger of collision since he figured it was going to be a tight place to get round, and ordered two turns of his wheel to the right, then a hard right, but he did not note how much his ship swung as his attention was focused on The Paisley. When he saw Paisley's stern go by the Junction Buoy, that buoy was right under Paisley's port quarter, when a collision was already unavoidable. He said he was then from 100 to 200 feet from The Paisley. He backed full speed, sounded the alarm, and dropped anchor. As the time of contact The Morrell's headway was about three miles per hour.

14. Captain Colson said it was apparent to him that The Paisley had difficulty in making the turn, even without having a danger alarm from her, and that he knew his own ship was slow to respond to either a right or left rudder—the slowest ship in that respect of which he ever had charge. He testified further that if he dropped his anchor and reversed when he was 600 feet below the Junction Buoy, he might be pretty near stopped at the time of collision, that he was backing probably a minute and a half, that The Morrell went ahead more than 100 feet, that she lost two-thirds of her headway in 150 to 200 feet and would probably lose all her headway if anchor were dropped and the engines reversed when 600 feet below the Junction Buoy. He insisted that he relied on the original passing agreement—that he was to keep his course and speed on his side of the channel, and that he expected The Paisley to turn all the time. But, by his own admission, he saw, when 600 feet away, that The Paisley was having difficulties in her efforts to turn and so, he could have averted the collision by sounding a danger alarm and reversing at that distance.

15. As experienced a mariner as Captain Colson should have clearly appraised the situation involved in the meeting of the two vessels, under the circumstances here. He knew that the Paisley would require a wide radius to negotiate the turn and would therefore occupy most of the channel at the time of making the turn, and that ordinary precaution should have been exercised by him when he became aware of the risk of collision. His duty would have been no different, assuming The Morrell to have been the privileged vessel on a crossing course, as contended by respondent, since the master of a ship cannot close his eyes to obvious dangers and rely implicitly on proper navigation of the other ship when it is apparent to him that the other ship, because of faulty navigation and through failure to give proper signals, is not complying with the pilot rules for navigation of vessels.

16. There is about 800 feet of shallow water between Peche Island shore and the southeast edge of the navigable channel, near which the collision occurred, so that The Morrell could not have been 250 feet from the shore of Peche Island at the mo-

ment before the impact, as asserted by Captain Colson.

## Conclusions of Law.

 1. When the two vessels sighted each other they exchanged port-to-port passing signals. The Paisley was the downbound steamer, and although the headings of the two vessels were nearly at right angles shortly after the port-to-port passing was agreed upon, the masters of both vessels knew that The Paisley was turning on right rudder around the Junction Buoy and would be heading downbound after negotiating the turn. They were therefore in a meeting situation and not a crossing situation. The Paisley had the right of way. Pilot Rule 24, 33 U.S.C.A. § 289; Lake Erie Transp. Co. v. Gilchrist Transp. Co., 6 Cir., 142 F. 89. The Morrell was burdened with the duty of keeping out of The Paisley's way. The George Presley, 6 Cir., 111 F. 555.

2. Even though The Morrell, as the ascending vessel, initiated the passing port-to-port signal, The Paisley, by also signaling for port-to-port passing, made her own choice, in accordance with her rights and duties under Rule 24. The Elizabeth Jordan, 2 Cir., 63 F.2d 781.

 3. It was the duty of Paisley's master, when he saw The Morrell on his side of the channel and not complying with the passing agreement, when the two vessels were well within one-half mile of each other, to sound a danger signal of several short and rapid blasts of the whistle, not less than four, and to slow down to a speed barely sufficient for steerageway, and, if necessary, to stop and reverse, until proper signals were exchanged and understood, or until the vessels should have passed each other, but not to proceed until safe passing was assured. Rule 26, Great Lakes Pilot Rules, 33 U.S.C.A. § 291; Sec. 322.2, Coast Guard Navigation Rules. The Paisley was guilty of a navigational fault in failing to take these necessary precautions for the safety of both vessels under these rules.

 4. The Morrell's contributory fault rests in her neglect to take timely precautions to avoid the collision, in her failure to sound a danger alarm until the two vessels were in the jaws of collision, in knowingly maintaining her course and speed in a situation pregnant with danger to both vessels, until too late to avoid that danger, and in her failure to slacken her speed and to reverse sooner, as good seamanship would indicate in the perilous situation, to the creating of which both vessels contributed.

 5. Where, as here, each vessel in turn failed to obey mandatory rules of navigation for its own safety, when compliance with such rules would have prevented the collision, each will be held to be equally and concurrently at fault in causing the collision, and equally responsible for the damage resulting from it.

6. A decree providing for divided damages may be presented on notice.