**NATIONAL STEEL CORPORATION, a corporation, Plaintiff and Cross-Defendant,**

v.

**KINSMAN MARINE TRANSIT COMPANY, a corporation, Defendant and Cross-Complainant,**

**and**

**Bibby Line, Ltd., a corporation, Defendant and Cross-Defendant.**

**Civ. No. 32926.**

United States District Court, E. D. Michigan, S. D.

March 5, 1972.

Scholl, Jenkins, Robinson & Stieg, Detroit, Mich., Johnson, Branand & Jaeger, Cleveland, Ohio, for plaintiff National Steel Corp.

Lee C. Hinslea, Brecksville, Ohio, Harrison, Gruber & Gaughan, Buffalo, N. Y., Victor G. Hanson, Detroit, Mich., for defendant and third party plaintiff, Kinsman Marine Transit Company.

Foster, Meadows & Ballard, Detroit, Mich., for defendant Bibby Line Limited.

## OPINION

TALBOT SMITH, Senior District Judge:

In the early morning of October 21, 1967, the Great Lakes freighter James E. Ferris (hereafter Ferris) came in collision with the Ernest T. Weir (hereafter Weir), a Great Lakes bulk carrier, in the St. Clair River near the Chesapeake and Ohio (hereafter C & O) docks on the Canadian shore. Each vessel blames the other and both join in blaming, as well, the British motor vessel Toronto City. She was maneuvering nearby to go upstream alongside the Port Huron Terminal. Damage resulted to both the Ferris and the Weir, as well as to the C & O docks. In addition, crewman Marsh, of the Ferris, alleges that he suffered personal injuries as a result of the collision.[a]

---

a. The parties hereto have agreed (Pre-trial Order, p. 8) that their respective liabilities to Marsh, if any, will abide the outcome of this litigation, particularly with respect to possible "intervening negligence" on the part of Ferris, should we find fault on the part of either the Toronto City, or Weir, or both.

National Steel Corporation, as owner and operator of the Weir, filed suit against Kinsman's predecessor as owner and operator of the Ferris, and Bibby Line Limited, as owner and operator of the Toronto City. Kinsman and Bibby Line appeared in that action, denying liability. Kinsman filed a cross-libel seeking recovery of its damages against National Steel and Bibby Line, who in turn appeared and denied liability on behalf of the Weir and the Toronto City. As the Toronto City sustained no damages, she has sought no affirmative relief against either the Weir or the Ferris. It was stipulated by the parties that the collision occurred in Canadian waters and the liabilities of all three vessels, if any, were to be determined by the Canadian rule of comparative negligence rather than the American rule of equal division of damages. Also that, the Canadian and American Rules of the Road being the same, the Court should apply the American Rules.

The Weir is an American flag conventional straight deck Great Lakes bulk carrier, having an overall length of 690', beam of 70'4". She is a single screw vessel powered by two steam turbines developing 7700 shaft horse power and is equipped with radar, AM and FM radio telephone. On the morning of October 21, 1967, the Weir was proceeding upbound on the Canadian side of the St. Clair River in ballast, drawing 14'6" forward and 19'2" aft.

The Ferris is a conventional type Great Lakes freighter of American registry, having registered dimensions of 444 feet in length, 56 feet in breadth, of 5494 gross tons burden and powered by a 1600 horse power triple expansion steam engine with single screw propeller. She is equipped with engine room telegraph, (Chadburn) AM and FM radio and radar. At the time of the accident, she was carrying 346,605 bushels of grain on a voyage from Duluth, Minnesota to Buffalo, New York, with drafts of approximately 17'9" forward and 21'2" aft.[1]

The Toronto City is a foreign merchant vessel of British registry with registered length of 464'9" and a registered width of 63'7". Her bridge is aft with three hatches forward of the house and a single hatch aft. She is a motor vessel developing 9600 bhp. The vessel has a controllable pitch propeller and is equipped with radar, AM and FM radio telephone. Her draft upon berthing at Port Huron Terminal on the morning in question was approximately 5'5" forward and 19'1" aft.

The parties to this litigation have entered into a written agreement with the Chesapeake & Ohio Railway that liability for provable damages sustained by the Chesapeake & Ohio Railway shall be governed by the outcome of this litigation, and, accordingly, the Chesapeake & Ohio Railway has not intervened in this proceeding or commenced separate action for damages.

Certain distances in the area of the St. Clair River where the collision occurred also have been stipulated, as follows: The Blue Water Bridge which crosses the river between Port Huron, Michigan, and Sarnia, Ontario, is approximately three miles upstream from Port Huron Terminal on the American shore; the Chesapeake & Ohio Railway maintains a dock installation on the Canadian shore of the river about ½ mile downstream from Port Huron Terminal. The river is about 1600' wide at Port Huron Terminal and at the Chesapeake & Ohio Railway dock installation; Indian Point on the Canadian shore is about 1½ miles downstream from the Chesapeake & Ohio Railway dock installation.

On the date under consideration, the Toronto City was bound for the Port Huron Terminal. She and the Ferris were downbound in the St. Clair River, the Ferris being astern of the Toronto City. The Weir was upbound, on the Canadian side of the river. The Toron-

---

1. The Pre-trial order listed the draft aft as 12'2", an obvious typographical error.

to City had announced, by security call, that she intended to turn in the river on right rudder to land at the Port Huron Terminal on the American shore. The presence of each vessel was known to each of the others. There was no fog and the night was clear, with unlimited visibility. Prior to Toronto City's turn, she and the Ferris had agreed that the Ferris was to pass under the turning vessel's stern. Ferris did so but shortly afterwards came into collision with the Weir just off the C & O Dock. Further details will be discussed in connection with the various issues raised.

In this situation Weir asserts that both Ferris and Toronto City were guilty of joint and concurrent fault resulting from the negligent navigation and operation of both vessels. The Ferris charges the Toronto City or the Weir, or both, with fault. The Toronto City, for her part, asserts that the collision between the Ferris and the Weir was caused solely by the joint and concurrent fault or negligence of the Ferris and the Weir.

Toronto City was uninjured in the collision and we will examine first her operation and the claims made against her. We observe, before getting into our findings and conclusions, that the record is a mass of contradictions. Witnesses differ as to the times of critical occurrences, the locations thereof, the distances between the vessels themselves, and between the vessels and shore locations. Messages assertedly sent are not received and, when received, vary between the parties as to their content. In view of the pre-dawn darkness, the fact that many of the observations made involved estimates from running and range lights, as well as shore lights and structures, plus the lack of synchronization between timepieces on the various vessels, as well as the stress and strain of the crisis ultimately presented, the variances in the various accounts are not entirely unexpected. In this situation we have relied strongly on certain physical facts and upon our observations and appraisals of the attitudes and demeanors of witnesses, as well as of the content and reasonableness of their various assertions.

In the early morning of October 21, the Toronto City got underway from her anchorage in Lake Huron and proceeded down the St. Clair River. The wind was southwesterly at force 3 (it is not a factor in the case), the weather cloudy and the visibility clear. Captain Hine was on the bridge, along with Pilot Bowie (who died before this case came to trial), Fourth Officer Kendrick, and Quartermaster Thompson. The vessel's navigation lights were functioning properly. Her engine is bridge-controlled (she has a controllable pitch propeller) by means of a "combinator handle." This has both ahead and astern positions ranging from one to ten. Moving the handle ahead causes the vessel to move forward, moving it backward causes the vessel to move astern. The speed ahead or astern is controlled by increasing or decreasing the combinator handle settings. The various settings of the combinator handle are mechanically recorded on a "graphic recorder" situated on the bridge. This instrument contains a roll of paper having lateral lines indicating the time, with longitudinal lines indicating engine directions and settings of the combinator handle. It does not record the rudder angle.

The Toronto City's testimony was that she issued five security calls after weighing anchor and prior to her arrival at the Port Huron Seaway Terminal. Each call was made first by the Pilot on VHF and then repeated by Captain Hine on Channel 51. The first security call was made at 5:35 a. m., EDT, when the vessel weighed anchor; the second at approximately 5:52 a. m., EDT, in the vicinity of Buoy No. 5 above the Blue Water Bridge; the third in the vicinity of Buoy No. 1 above the Blue Water Bridge; the fourth at approximately 6:13 a. m., EDT, as the vessel cleared the Blue Water Bridge and the fifth when the vessel was in the vicinity of the Port Huron Seaway Terminal. All five security calls indicated that the To-

ronto City was proceeding downbound to the Port Huron Terminal. The last four security calls indicated that she intended to turn on right rudder in the area off or below (calls three and four) the Imperial Oil Dock. The fifth, her Captain asserts, indicated that she intended to turn off· the Imperial Oil Dock or in that area in five minutes.

The Ferris, also downbound, passed the Lake Huron lightship at the southerly end of Lake Huron around 4:49 a. m., EST, and entered upon navigation of the St. Clair River. Her normal river gait, she concedes was 10½ mph. · She has a different version of the above-described calls. She asserts that while still about ½ mile above the Blue Water Bridge, she monitored a radiotelephone call from the Toronto City advising that she, the Toronto City, was downbound in the St. Clair River and would be turning at the Imperial Oil Company Dock to go into the Port Huron Terminal in approximately ten minutes, and that this call occurred at approximately 6:24 a. m., EDT. (The Toronto City, because of the course of the river, was not in view of the Ferris at that time.) It is also her position that after monitoring the call from the Toronto City, she, Ferris, issued her own security call over the radio telephone at approximately 5:25 a. m., EST, advising that she was downbound in the St. Clair River two minutes above the Blue Water Bridge.

Ferris proceeded downriver, as did the Toronto City. When in the vicinity of the traffic buoy (Pos. N–1, Pf's Ex. 6) she first observed the lights of the Toronto City proceeding downbound and paralleling the Canadian shore. In the same vicinity Ferris monitored another call from the Toronto City to the effect that the vessel would be turning into Port Huron Terminal in about 2 minutes. This is probably the call that Toronto City states announced the turn in about 5 minutes. It was at this time that Ferris notified Toronto City that she intended to pass beneath or under her stern as she turned. The Weir also heard and confirms this call.

Toronto City made her turn, but there is much controversy over just when and where it was commenced, whether it was made in two minutes (from wherever Toronto City was, exactly, when she allegedly set such time) or in five minutes, whether it was in the area of the lower Imperial Oil dock, as Toronto City asserts, or more upstream, at a point opposite the Imperial Oil dock, as Weir asserts, or abreast or even a little above the Port Huron Terminal, as Ferris argues. These geographical locations, it will be observed, are not specific but generalized, referring to areas, not precise locations. The parties seek to support their various assertions as to the exact time and place of the turn with various mathematical computations, none of which we trust because of the unknown, unmeasured variables involved in the solutions, such as current, distances, and speeds over the ground (as distinguished from revolutions per minute, rpm), and, indeed, the approximate time of occurrences, since the vessels were not synchronized in their timepieces. In fact, the time of collision itself varies in terms of minutes between the vessels (from 0546 to 0549) and this variation in timepieces casts doubt upon all mathematical computations involving time and the distance travelled therein. Although, for reasons to appear, we need not attempt to completely reconcile the differences, it is our judgment upon the record as a whole, particularly the exhibits tendered, our conclusions as to credibility, and the maneuverings of the vessels involved, that Toronto City made her turn above the C & O dock at· approximately Position T–2, Pf.'s Ex. 5, at a distance of some 750′ upriver therefrom and 400 feet off the Canadian shore, being then in the area of the lower Imperial Oil dock.

We made this finding, however, solely out of deference to the exhaustive efforts of counsel to establish the point of turn, not because of any legal necessity therefor. The stark physical fact is that all of the vessels. involved were within sight of one another during the

entire maneuvering time, save for the short interval (time for passage of one boat length of Ferris) when Ferris and Weir were blocked from each other's vision by the superstructure of the Toronto City, a development normally to be expected under the circumstances.

Visible to each other, then, they were, regardless of where the turn was made. The Weir saw Toronto City commence a "sharp turn" in the area above the C & O dock. Weir felt no alarm, sounded no danger signal. Ferris likewise saw the turn, after being advised by Toronto City of her intention to turn, after telling Toronto City that she would pass under her stern, and with full knowledge that the Weir was coming up river. Like the Weir, Ferris was not alarmed at her maneuver, but proceeded in accordance with her passing agreement with Weir, even to the point of exchanging passing signals with the Weir as Toronto City was maneuvering nearby in the river.

■ In short, no one was surprised, no one was taken aback, and no danger was felt. It is well to keep in mind that the maneuvers being accomplished were common in the river. Moreover, unlike an automobile turn at a certain milepost, a vessel's turn is in (here) a flowing current. "You're working," Captain Ostrander, testifying as an expert, stated, "in an element that is unstable."[2] His testimony, moreover, would indicate that the precise point of turn made by a vessel, after the statement of turn is made, is not precisely fixed. "[T]here's not a specific point right now that this is where I'm going to do this. You make a statement. You look, and when it feels right that's how you do this business. If you're a pilot, when things are right, you make your turn."[3] Our conclusion on this phase of the case is that the announcements of the Toronto City as to where and when she intended to turn are not to be interpreted as a commer-

cial contract but as an expression of a mariner's purpose and so to be construed.

■ As to the turn itself, the Toronto City came over on hard right rudder. Her time of turning was logged as 6:42 a. m., EDT.[4] The Captain himself was operating the combinator handle. The setting was between $\frac{3}{4}$ and one ahead. She answered the helm very quickly. As Capt. Anderson, of the Weir, who observed the turn from his downriver position, put it, "I saw him whip around and he whipped around fast."[5] After approximately one minute (as measured on the graphic recorder chart heretofore described) the combinator handle setting was increased to two ahead in order to increase the vessel's swing downriver. Two minutes later, at 0645, the setting was moved astern to a setting of four and the helm put amidships to further increase her swing and to keep from approaching too closely the American shore. This astern movement merely checked her way and did not actually result in sternboard. At 6:45, she let go the starboard anchor to one shackle, thus not only further increasing her swing but keeping her short of the American shore. At this time the vessel's bow was some 100 feet over the centerline of the river and about 700 feet from the American shore. At 6:47, the combinator handle was placed on a setting of $1\frac{1}{4}$ ahead, to swing the vessel upriver on her anchor and to bring her bow to the approximate center of the American channel, and the rudder once again brought right. The turn was substantially completed at 6:48 a. m., EDT, at which time she was around and heading upriver at an angle of around 45°, her stern about in the center of the river. She experienced no mechanical or other difficulties during the turn. We are satisfied that the turning maneuver was accomplished in a seamanlike and expeditious manner.

---

2. Tr., 1245.

3. Tr., 1255.

4. The Toronto City was on Eastern Daylight Time, not Eastern Standard.

5. Tr., p. 87.

It is the essence of the charges made against Toronto City that she did not complete her swing in the manner we have just found, but rather that having commenced her turn she came broadside in the river and then hung there, as Ferris puts it, "broadside in the river for upwards of five minutes," thus embarrassing and impeding Ferris' navigation around her stern and contrary to the turning vessel's "agreement" to get around expeditiously and then get out, upon which she, Ferris, relied in shaping her navigation.

The Weir joins Ferris in complaining of the turn. Toronto City, says the Weir, lay broadside or crossways in the river from the time she swung to right rudder until after the collision. It is Weir's theory that she drifted down the river, athwart it, dragging her anchor and hampering the navigation of both Weir and Ferris.

The principal difficulty with the theory of the Toronto City lying broadside in the river with her starboard anchor down and against the river current is that as a matter of seamanship it is a maneuver almost impossible to accomplish. The only way it could be done, and we are not fully convinced that it would be possible even under these circumstances, considering the draft of the vessel, and the current, would be to give the ship hard left rudder, hold it there, and work ahead strongly with the engines. The experts, at least as to this matter, all concur that it could not be done accidentally, fortuitively, or by mistake. Just what motivation Captain Hine would have for even attempting this feat was never brought out. In fact, he was already behind his vessel's schedule when he started his turn.

The engine settings, as we have noted, were automatically recorded on a graphic recorded tape. Counsel have not pointed to any "ahead" engine setting of the magnitude required to hold the ship with left rudder against the current.

Actually the engine was astern for two full minutes in the middle of the maneuver. It is our conclusion that for no substantial period of time did the Toronto City remain motionless athwart the river. Her swing was practically continuous throughout. As to her position at the time of the collision being broadside or crossways in the river, as Weir asserts, the most revealing physical evidence came from Captain Anderson of the Weir. Just prior to the collision, or shortly thereafter, he observed the starboard anchor chain of the Toronto City leading slightly astern. The starboard anchor chain hanging down cannot, of course, be seen from the port side of the ship save at the very stem. Captain Anderson could not possibly have seen the starboard chain so tending if the Toronto City had been broadside in the river. Rather, she must have been headed up river at an angle to the American shore, as was testified by her master, Captain Hine. There is no convincing testimony in this record that she did other than make a seamanlike turn in an expeditious manner. There was, it was testified, some dragging, with the chain leading astern, as she came around but this was not protracted and did not hamper her turn.

In so holding, we have not overlooked such testimony as that of Car Inspector McCormick [6] that Toronto City was "laying there," or that of Trainmaster Begg [7] that she was "hanging in the river there for quite a little while." But the time required for such a turn was stated by the experts to be between five and seven minutes,[8] or from six to eight minutes,[9] the Toronto City on this occasion taking about six minutes, so it is clear that she must have been to some degree "crosswise" in the river, that is, not paralleling its shores, for "quite a little while." Such generalized observations, true, of course, within their inherent limitations, have little probative value with respect to the issues before us.

6. Tr., 486.

7. Tr., 517.

8. Captain Ostrander, Tr., 1240.

9. Captain Meno, Tr., 894.

Both Weir and Ferris charge the Toronto City with dereliction in not having a lookout astern. There are, of course, circumstances in which the failure to have a lookout astern, properly posted and instructed (e. g., overtaking situation in a fog) may have a causal connection with collision, either direct or remote. But there are also situations in which the absence of such a lookout can have no reasonable bearing upon fault or negligence in connection with collision. This is such a case. Here all vessels were constantly within sight of one another as they drew near. In the Toronto City, personnel on the bridge had kept both the Ferris and the Weir under observation, not only prior to the turn but during the turn itself. Security calls had been exchanged. Ferris had announced her intention to go under Toronto City's stern. Weir was aware of this. Weir and Ferris had not only agreed upon a port-to-port passage by radiotelephone, but had actually (later) sounded the appropriate blasts.

In this situation we would indeed be dredging the double bottoms to find that Toronto City's failure to post a stern lookout had anything to do with the ensuing collision. The case of The Georg Dumois, 153 F. 833, (4th Cir. 1907), puts the matter well:

If the schooner was seen at a distance sufficiently great to have enabled the steamer to pass her in safety, then the collision must have been caused by some fault other than the absence of a lookout. 153 F. at 835.

The same point was examined, with the same result, in Maroceano Compania Naviera, S.A. v. S.S. Verdi, 312 F. Supp. 489 (S.D.N.Y.1970), reversed on other grounds, 438 F.2d 854 (2d Cir. 1971), the Court stating at 493:

A lookout is required by both the International Rules of the Road and by good seamanship. The failure to have one can at times be a fault and the cause of a collision, especially if there is no knowledge of the other vessel. See, e. g., The Colorado, 91 U.S. 692, 699, 23 L.Ed. 379 (1875); United States v. S. S. Soya Atlantic, *supra*. However, here the vessels had sighted each other and the function of a lookout was therefore *not* required. Although the Pentelikon's lookout did leave the wing of the bridge and go below for coffee, the court finds that this could not have been a proximate or contributing cause of this collision [Footnote omitted; emphasis in original.]

Similarly, here, we find that the absence of a stern lookout on the Toronto City "could not have been a proximate or contributing cause of this collision."

We turn now to the Weir and the Ferris. We have noted heretofore their characteristics. As Weir proceeded up river, and still below Indian Point, in the vicinity of the city of St. Clair, she heard a security call from a vessel then identified as the "Chirodo City" which was headed down river to turn into a dock in the vicinity of Port Huron. Since it would be 45 minutes or longer before the Weir would reach that vicinity, the Weir was not concerned. She proceeded up river at her regular running gait of 90 rpm, her first mate navigating the vessel and Captain Anderson in his chair in the pilothouse.

The Ferris was at this time downbound on Lake Huron. She passed the Lake Huron Lightship at 4:49 a. m., EST. Captain Krusell (now deceased) was in charge of navigation, and with him were the first mate and wheelsman. A lookout was on the bow. Ferris' speed as she entered the St. Clair River and passed under the Blue Water Bridge was her normal river gait of 10½ miles per hour. This approximation of speed does not take into consideration the current. The velocity of the current in the St. Clair River between the Blue Water Bridge and the C & O dock is strong, and the area is difficult to navigate. While there is some reduction of the current downstream from the bridge, the velocity in the vicinity of the C & O dock averages from four to six miles per hour (4 or 5 knots), and current conditions existing on the morning of October

21, 1967, were average. The flow of current in the river is toward the Canadian side and as it gets closer to that side it increases, the greatest velocity being along the area of the C & O car-ferry slip. The greatest flow or greatest amount of current extends generally from the upper end of the Imperial Oil dock, which is on the Canadian side of the river opposite Port Huron Terminal, down to the Polymer dock, located on the Canadian side about 1700′ below the C & O dock. The effect of the current on a vessel in the area of that current is to cause the ship to drift toward the Candian shore.

When the Weir was still below Indian Point, she overheard a radiotelephone conversation between the Toronto City and the Ferris wherein it was understood between those two vessels that the Ferris would pass under the Toronto City's stern as the Toronto City made her right rudder turn into Port Huron Terminal. The Weir at this time responded with a security call advising that she was upbound at Indian Point. Thereafter, it was testified, the Weir heard a second security call from the Toronto City advising that she intended to start her turn into Port Huron Terminal. This version of the call quotes the turn as intended to be made in two minutes. As the Weir rounded Indian Point, she was on the Canadian side of the center of the river and she observed a downbound vessel, also on the Canadian side of the river. The Weir then was steering on a light on the Canadian shore just clear of the downbound vessel.

Shortly thereafter the Toronto City was observed to turn on right rudder. About that time the Weir checked her speed to 65 rpm because of the presence of a vessel unloading at the Dow Chemical Dock, and the Weir wanted to be careful not to create suction while passing that vessel. The Weir · altered course slightly further to starboard to clear the stern of the Toronto City, since the latter vessel's swing on right rudder carried her stern closer to the Canadian shore. The Toronto City's stern then was approximately 400′ off the Canadian shore and her bow about the center of the river.

As the Weir continued upstream under check at 65 rpm, she observed the Ferris across the deck of the Toronto City. The Ferris was proceeding downstream about the center or a little on the Canadian side of the river. Although there is controversy with respect to it, we find as a fact that the Weir contacted the Ferris by radiotelephone and proposed that the two vessels would meet on one whistle and the Ferris agreed. The Weir thus knew that it was her obligation to direct her course to starboard toward the Canadian shore and that the Ferris would turn to her starboard toward the American shore when the two vessels approached each other so that each would pass to the port side of the other. Even without the disputed radiotelephone call, this would have been the normal action of the vessels under these circumstances. Still proceeding under check, the Weir directed her course further to the right and closer to the Canadian shore. While the check of the Weir to 65 revolutions initially was because of the presence of the vessel at the Dow Chemical Dock, the 65 revolution speed was maintained in view of the passing situation.

Shortly after the passing agreement was reached with the Ferris, the latter vessel called to advise that the Weir had disappeared from the Ferris' view behind the Toronto City. That development did not alarm the Weir since she expected the superstructure of the Toronto City to block out the view of the Ferris and the Weir from each other. In order to reassure the Ferris that the Weir was getting over as close to the Canadian shore as she could, the Weir responded that she was "digging" for the Canadian shore, a term meaning that she was steering close to the Canadian shore to give the Ferris all the room possible.

Upon receipt of that call from the Ferris, the Weir reduced her speed from 65 to 40 rpm and altered her course fur-

ther to the right, toward the Canadian shore. We find that the Weir's further reduction of speed to 40 rpm was in accordance with good seamanship. Because of the Weir's light draft, and the depth of the water along the shore, the Weir was able to maneuver as close as approximately 50' to the C & O dock. After this alteration of her helm the Weir's heading was very slightly off of or to westward of the C & O dock. When she checked to 40 rpm, the Weir was in the vicinity of the Polymer dock.

The Ferris then reappeared between the stern of the Toronto City and the Canadian shore. She was heading towards the Canadian shore, approximately a half-mile above the Weir. Weir's red navigation light was visible to her, indicating that Weir was directing her course to starboard. It was about or slightly before [10] this time that Ferris checked to half speed in an attempt to take off some of her way, but she was still proceeding at a high rate of speed for the circumstances presented, whereas the Weir's speed was reducing constantly as she proceeded under check against the strong current. Since the Ferris did not initiate the exchange of passing signals required by the Pilot Rules, the Weir sounded one blast of her whistle for a port-to-port passing agreement. Upon hearing the Weir's signal, the Ferris was just about to signal the Weir, and hence she answered immediately with one blast. The Weir then was closer to the Toronto City than the Ferris but still below the Toronto City, and well over toward the Canadian shore. There was clearly adequate room for the Ferris to pass under the stern of the Toronto City at this time and no apprehension was felt aboard the Weir concerning the meeting agreement when the one-blast signals were exchanged, nor was there any indication from the Ferris that she anticipated any difficulty in carrying out her agreement with the Weir.

The Weir, for her part, was not concerned and there was no apparent danger until the Weir perceived that the Ferris was not making her haul around the stern of the Toronto City. There was at the least some 200' between the stern of the Toronto City and the starboard side of the Ferris and 150' between the port side of the Ferris and the C & O dock, the Ferris being approximately halfway between the line-up of the Toronto City and the shoreline. The Weir was only about one boat length or less, 500'–600', from the point of collision. At this point the Ferris was still above the Toronto City. The Weir's master here sounded the alarm bells to alert his crew to possible danger and himself stepped into the front window to relieve the mate.

The Ferris continued ahead but straightened her course for going under the Toronto City's stern as she approached the Toronto City. The Weir was setting toward the Canadian shore. However, the Ferris still was heading across the Weir's heading and she did not turn to starboard to pass under the Toronto City's stern and clear the Weir until the Ferris' bows were very close to and slightly upstream from the stern of the Toronto City. At this time Ferris placed her rudder hard right and rang up full ahead on the engines to start a swing. The full ahead was on only "for a very short period,"[11] when it was followed by a "double jingle" (meaning "full power astern"). The mate of the Ferris testified that even then he thought there was sufficient room to carry out their passing agreement with Weir.

Ferris cleared Toronto City's stern but her turn was made too late to clear the Weir and the two vessels collided about a boat length below the Toronto

10. There was a discrepancy between Ferris' "bell book," maintained in the engine room, and the log book as to the time of this check. Tr., 687.

11. Tr., 768.

City or about 400' downstream from the C & O dock.

The force of the impact caused the Weir to set over to starboard against the dolphin at the lower end of the C & O dock. Immediately after the Ferris struck the Weir her rudder was put hard left to throw her stern away from the Ferris and her engines were worked full speed astern. The impact with the dolphin was a slight brushing at the Weir's starboard bow, which caused the bows to push out into the river. The vessel's headway then was stopped. Following collision both vessels proceeded to anchorage.

The Ferris urges to us that Weir was at fault in failing to check her speed and altering her course sufficiently to avoid collision, as well as in failing to sound the danger signal, at least when she sounded her alarm bells. Weir, on the other hand, asserts that Ferris was proceeding at an excessive rate of speed and negligently failed to make her turn around the stern of the Toronto City at a point consistent with good seamanship. The operation of each of the vessels demands careful examination.

First as to the upbound vessel, the Weir. Upon learning of the presence in the river of the Ferris and the Toronto City, she made a security call advising of her location. At the Dow Chemical dock she checked her speed lest she disturb a vessel then unloading at the dock. She proceeded thereafter under check out of an abundance of caution, since it is clear that the projected maneuver of Ferris and Toronto City (i. e., the passing vessel turning under the stern of the turning vessel) was a commonplace in the river. We are persuaded in the light of all of the testimony adduced and the circumstances of the case, that Weir did in fact enter into a passing agreement with the Ferris well in advance of their projected meeting. The Weir knew from such agreement that it was the obligation of each vessel to direct their respective courses in due time to starboard in accordance with Rule 17 of the Rules of the Road, providing as follows:

### RULE 17. STEAM VESSELS MEETING END ON

When two steam vessels are meeting end on, or nearly end on, so as to involve risk of collision each shall alter her course to starboard, so that each shall pass on the port side of the other.

As Ferris and Weir closed upon each other, the Ferris' view of the Weir was shut out by the cabin lights of Toronto City. This, obviously, was to be expected from the positions of the three vessels. Ferris expressed surprise upon seeing Weir, but the vessels were separated by a substantial distance and no alarm was felt in the Ferris. Nor in the Weir. But in the interests of good seamanship Weir had called Ferris (when told by Ferris that she had "lost" her) and told Ferris that she was "digging" for (i. e., steering towards) the Canadian shore. The Weir further reduced her speed at this point to 40 rpm.

The situation at this moment was not alarming. There was approximately 400 feet between Toronto City's stern and the Canadian shore, ample for the Ferris and Weir to meet and pass on one whistle, it being, in fact, common practice on the lakes to pass in much closer quarters. This must also have been the then belief of the Ferris since, as the downbound vessel, though not having initiated the passing signal in accordance with Rule 24, *infra,* she had responded to Weir's one blast with her own one blast. Obviously no alarm was yet felt. Ferris considered a port-to-port passing feasible in the space before her and Weir had no reason (at this point) to feel otherwise. The situation, in fact, was that contemplated in the earlier passing agreement. At this time Weir was already very close to the Canadian shore. She was heading so that her steering pole was just past the C & O dock, in fact it was questionable in the mate's mind whether the dock would be cleared. Nevertheless the Captain of

the Weir then told the helmsman to "right it a shade."[12]

The Ferris argues with vigor and skill that the Weir could have stopped downstream, say at the Polymer dock, and held herself with safety against the current, and that she should have done so until Ferris had passed. We question the premise. It requires a high degree of seaman's skill to maintain with safety and control a vessel of the size of the Weir in a stopped situation, close to shore, against a strong setting current. But this point need not be explored, since the fact of the matter is that there was nothing in the situation presented to warrant such action on Weir's part. Weir confronted a common situation on the river. She was entitled to rely upon the announced intentions of the Ferris and their mutual understandings. As held in The Victory and The Plymothian, 168 U.S. 410, 18 S.Ct. 149, 42 L.Ed. 519 (1897),

> * * * Each of these vessels was entitled to presume that the other would act lawfully; would keep to her own side; if temporarily crowded out of her course, would return to it as soon as possible; and that she would pursue the customary track of vessels in the channel, regulating her action so as to avoid danger. 168 U.S. at 426, 18 S.Ct. at 156.

As to the standard particularly applicable to the Weir, the Court continued:

> The rule applicable to them was that each should keep to her own starboard side of the channel. So long as the vessels were port to port, the Plymothian, proceeding at moderate speed, was not bound to stop and reverse on the chance that the other vessel might depart from the rules of navigation. 168 U.S. at 426, 18 S.Ct. at 156.

In this circuit, the leading case is Lake Erie Transp. Co. v. Gilchrist Transp. Co., 142 F. 89, on page 95 (6th Cir. 1906), where the Court stated:

> " * * * The Rome was not bound to anticipate that the Mack would not act lawfully and comply with her agreement, and so long as there was apparent reasonable opportunity for her to swing and clear the Rome the latter might assume that she would do so. This is the doctrine as we read and construe the cases of The Free State, 91 U.S. 200, 205, 23 L.Ed. 299; The Servia, 149 U.S. 144, 154, 13 S.Ct. 817, 37 L.Ed. 681; The New York, 147 U.S. 72, 13 S.Ct. 211, 37 L.Ed. 84; The Victory v. The Plymothian, 168 U.S. 410, 427, 18 S.Ct. 149, 42 L.Ed. 519, and the case of The Elphicke, 6 Cir., 123 F. 405, 407, 59 C.C.A. 286, a case decided by this court, the opinion being by Judge Severens. Neither was the Rome required to consider the possibility that the Mack would be unable to comply with her agreement or that she would, through negligence, persist too long in her original course.

> "In Marsden on Collisions at Sea (3rd Ed.) 351, it is said:

>> 'In estimating risk of collisions, it seems that the possibility of the other ship being unable to comply with the regulations, or of her negligently departing from them, is not, at least under ordinary circumstances, to be taken into consideration.'"

See also Jack Neilson, Inc. v. Pure Oil Company, 233 F.2d 790 (5th Cir. 1956), holding that under a normal port-to port passing situation a vessel had a right to proceed at reduced speed under the assumption that such a passing would be made.

There came a point, however, when alarm was felt on the Weir. The port-to-port passing signals had been exchanged but the Ferris "was coming down parallel and across our [Weir's] bow" testified the Weir's captain, and, continuing, "there was a little delay in there, and that's what concerned me, and I finally detected a slight swing." The

12. Tr., 106.

Ferris was still approaching at a high rate of speed, "a pretty good clip."[13] Captain Anderson's estimate at the time of collision was "eleven, twelve miles an hour" (Tr., 119), with shoreside witnesses agreeing that her speed was faster than that usually observed. She had a noticable bow wake. Ferris was now close aboard. Weir was hugging the Canadian shore, as we have noted, a hundred feet or so off, having a seventy foot beam, heading just "clear of the C & O Ferry dock" and proceeding at bare steerageway. We are satisfied from the proofs that she could not have been controlled with certainty at a slower speed. Backing, even had there been time for its effectuation, was out of the question since reversing the engines might well have caused her stern to swing sideways, either to port or starboard, and either would have been dangerous. A swing to the right would have thrown the Weir's stern into the path of the Ferris, and to the left, her bows. Anchoring would have deprived her of the set of the current constantly carrying her to the Canadian shore, which gave Ferris all possible searoom. The vessels were, indeed, in the jaws of collision.

The point that has given us the most trouble at this juncture is the Weir's failure to sound a danger signal when she sounded her alarm bells. Prior to this point the situation is reasonably clear, both as to duties and liabilities. Despite the differences between the parties as to times (even the evidence as to time of collision is in dispute), despite the differences as to distances, as to speed, current, and the other variables, the facts gradually come into focus as the testimony of the various witnesses and the exhibits are put side by side: Toronto City was turning and Ferris attempting to pass under her stern. The maneuver called for skilled seamanship but is an everyday operation in the river. The Weir was upbound, proceeding at bare steerageway, close to the Canadian shore. The Ferris, coming downriver, was not proceeding with the care and caution good seamanship requires. Her speed was high, she was late in making her turn, she did not allow sufficiently for the advance of her vessel before the rudder took hold, and thus she collided with Weir, a grazing blow. Twelve feet more to her starboard and Ferris would have cleared. In the situation in which Weir found herself, due to Ferris' negligence, Weir is charged with a failure to sound the danger signal.

Rule 26 provides:

Rule 26. *Dissent to or misunderstanding of signal given; duty to reduce speed*

If the pilot of a steam vessel to which a passing signal is sounded deems it unsafe to accept and assent to said signal, he shall not sound a cross signal; but in that case, and in every case where the pilot of one steamer fails to understand the course or intention of an approaching steamer, whether from signals being given or answered erroneously, or from other causes, the pilot of such steamer so receiving the first passing signal, or the pilot so in doubt, shall sound several short and rapid blasts of the whistle; and if the vessels shall have approached within half a mile of each other both shall reduce their speed to bare steerageway, and, if necessary, stop and reverse.

■ The peculiarity of this case is that there was never any failure of either Weir or Ferris "to understand the course or intention of the other" nor was either pilot "in doubt" as to what was sought to be accomplished. But beyond that the Rules of the Road are practical rules, the distillation of years of experience. While they are to be interpreted strictly for the preservation of life and property, they do not demand the performance of fruitless or useless tasks. Thus it has been recognized that under some circumstances, where a vessel suddenly finds herself in peril due to circumstances beyond her control, the

13. Tr., 257.

sounding of a danger signal will serve no purpose. Hence the holding in The Queen City, 189 F. 653 (E.D.Mich.1910). This case has a unique application to the present circumstances. In *Queen City* the Moore and the Townsend were upbound in the Detroit River, the Queen City downbound with a tow. When the Townsend attempted to overtake and pass the Moore, suction from the Townsend caused the Moore to sheer uncontrollably into the downbound Queen City. The court held that the Moore was not guilty of contributory fault for failing to sound a danger signal. The language of the court as to the knowledge of the vessels is particularly applicable to the circumstances here, when the danger created by the Ferris became apparent to the Weir. In that respect the court stated on pages 659–660:

> Complaint is also made of the Moore for not giving warning to the Townsend of the danger. The Moore did blow a four-blast signal, which seems to be regarded as a request to check, but there is conflict as to when that was, whether more than one, and whether the Townsend paid any attention. However that may be, all danger existing, at any time, from any cause, was obvious to the Townsend at least as early and as clearly as to the Moore. As to the gradual drawing together of the boats, on converging courses, the Townsend knew that she had not ported on the range intersection, while the Moore could not know this fact until the convergence became pronounced. As to the sudden swing of the Townsend's stern, at the moment when most dangerous, this could not be anticipated by the Moore. Hence, fault cannot be predicated on the Moore's failure to sound an alarm.

In the case before us there is no evidence that a danger signal on the part of the Weir would have alerted either the Toronto City or the Ferris to any fact or potential danger not already known. It is our conclusion that Weir's failure to sound a danger signal did not, upon the facts and circumstances presented in this case, constitute fault on her part, or constitute a violation of Rule 26.

Ferris argues her "right of way," as a downbound vessel. There is no doubt that under Rule 24 [14] the Ferris was the privileged vessel. This rule provides that:

RULE 24. *Steam vessels meeting in narrow channels having current and certain rivers; right-of-way*

In all narrow channels where there is a current, and in the rivers Saint Mary, Saint Clair, Detroit, Niagara, and Saint Lawrence, when two steamers are meeting, the descending steamer shall have the right-of-way, and shall, before the vessels shall have arrived within the distance of one-half mile of each other, give the signal necessary to indicate which side she elects to take.

It is clear from this rule that the descinding steamer has an obligation to "give the signal necessary to indicate which side she elects to take." It will be noted that she must do so before arriving within ½ mile of the other vessel. In event she does not do so, the obligation falls upon the other vessel to initiate the passing agreement under Rule 23, which provides:

RULE 23. *Whistle signals of steam vessels to indicate course*

In all weathers every steam vessel under way in taking any course authorized or required by these rules shall indicate that course by the following signals on her whistle, to be accompanied whenever required by corresponding alteration of her helm; and every steam vessel receiving a signal from another shall promptly respond with

---

14. Rule 24 does not govern the situation before us.

**512**

the same signal or, as provided in section 291 of this title:

One blast to mean, 'I am directing my course to starboard.'

Two blasts to mean, 'I am directing my course to port.' But the giving or answering signals by a vessel required to keep her course shall not vary the duties and obligations of the respective vessels.

Beyond this point the obligations of both vessels were to comply with the Rules of the Road respecting the signals made. See Morrow S.S. Co. v. The Daniel J. Morrell, 90 F.Supp. 300 (E.D. Mich.1949), aff'd, 182 F.2d 347 (6th Cir. 1950), where it was held:

Even though The Morrell, as the ascending vessel, initiated the passing port-to-port signal, The Paisley, by also signaling for port-to-port passing, made her own choice, in accordance with her rights and duties under Rule 24. The Elizabeth Jordan, 2 Cir., 63 F.2d 781. 90 F.Supp. at 303.

■ The Weir, having initiated the signal, received acquiescence from the Ferris. It was the latter's duty thereafter to comply with the requirements of Rule 23, *supra*, and make a timely change of course to starboard. This she failed to do. The cases she cites, such as The Irving S. Olds v. The John M. McKerchey, 72 F.Supp. 256 (E.D.Mich. 1946), involving lack of negligence on the part of the privileged vessel are not in point.

■ The Ferris argues, as well, the "special circumstance" rule, and the doctrine of *in extremis*. With respect to special circumstances, the Rules provide as follows:

RULE 27. *Departure from rules to avert immediate danger*

In obeying and construing these rules due regard shall be had to all dangers of navigation and collision and to any special circumstances which may render a departure from the above rules necessary in order to avoid immediate danger.

The proper application of the above rule was considered in United States v. S.S. Malden, 224 F.Supp. 705 (E.D.Va., 1963), aff'd, 341 F.2d 292 (4th Cir. 1965). With respect to it, the court held:

Rule 27 is subject to very strict construction against the vessel claiming its benefit.

'Exceptions to these rules, though provided for by Rule 24 [now Rule 27], should be admitted with great caution, and only when imperatively required by the special circumstances of the case.' The Oregon, 158 U.S. 186, 202, 15 S.Ct. 804, 811, 39 L.Ed. 943 (1895).

And a ship trying to justify resort to Rule 27 'takes upon herself the obligation of showing both that her departure was at the time it took place necessary, in order to avoid immediate danger, and also that the course adopted by her was reasonably calculated to avoid that danger.' The Agra and The Elizabeth Jenkins, LR. 1P.C. App. 501, 504 (1867). 224 F.Supp. at 709.

In resolving the issue, the Court held at 710:

Where both vessels involved in a collision are properly lighted, and one of them is able to see the other, that latter one cannot attempt to show that special circumstances exist, but is governed rather by the ordinarily applicable rule of the road.

To the same effect see Oliver J. Olson & Co. v. Luckenbach Steamship Co., 279 F.2d 662 (9th Cir. 1960).

In view of the fact that the emergency finally experienced was of Ferris' own making, she is in no position to plead the "special circumstances" rule in

her favor. The same considerations apply to her resort to the doctrine of *in extremis*. It is true, of course, that "[w]here the master of a vessel placed in a situation of peril not of his making, has, acting within the bounds of reason, done that which at the time and under the stress and strain of the moment seemed to be the best thing to do, he will not be charged with fault by second guessing after the event." Green v. Crow, 243 F.2d 401 (5th Cir. 1957). But where, as here, the perilous situation is due directly to the fault of the vessel claiming the *in extremis* doctrine, she cannot find shelter in it.

■ Upon the above findings of fact we conclude, as matters of law, that

A. As to TORONTO CITY:

1. She was seaworthy, properly equipped, competently manned and at all times exercised care and caution in her navigation in all respects.

2. There was no fault or negligence on her part.

B. As to WEIR:

1. She was seaworthy, properly equipped, competently manned and at all times exercised care and caution in her navigation in all respects.

2. There was no fault or negligence on her part.

C. As to FERRIS:

1. Her fault and negligence constituted the sole and proximate cause of the collision and she is liable for the provable damages sustained by the WEIR and the C & O dock.

2. She is solely responsible for damages, if any, sustained by seaman Marsh.

The parties having stipulated that questions with respect to the amount of damages should not be made a part of the trial but reserved for subsequent hearing, no findings have been made with respect thereto.

A suitable order may be presented.